Mary C. Shelby *et al.*

*v.*

The Chicago and Eastern Illinois Railroad Company.

*Filed at Ottawa October 31, 1892.*

1. Contract—*by correspondence—when created.* Where the minds of the parties, through a written correspondence for the sale or purchase of real estate, meet as to all the terms of the contract, and the description of the property bought, its price, the terms of payment, the character of the deed by which the conveyance is to be effected and the nature of the title is to be assured, and the right of the purchaser to have certain dams maintained, and to the use of the pond and river for boating purposes as an incident or appurtenance to the land, is agreed upon, a valid contract will thereby be created, which either party may specifically enforce.

2. Same—*merger of contract for sale of land in a deed conveying the title.* Where a party owning an island in a river, and the adjoining lands, agrees in writing to sell a part of the island for picnic grounds, and to maintain certain dams upon the river so as to keep up a pond for boating excursions, and makes a deed for the land sold, if the agreement to maintain the dams is not executed by the conveyance it will not be merged in the deed or affected by it, and may be enforced.

3. In such case, the right of the purchaser to have the dams maintained for his benefit, if not in the nature of an easement appurtenant to the land sold, is a collateral right secured by the contract, and if not covered by the vendor's deed will not be affected by it, when there is nothing in the deed inconsistent with such right.

4. Corporation—*who may deny its power to contract.* A party who contracts with a corporation, and receives a consideration for his undertaking, can not be heard to insist that the contract is *ultra vires* as to the corporation, and thus escape liability and retain the consideration.

5. Conveyance—*construed as to reservation of rights.* A party agreed to sell a part of an island in a river, to be used as a pleasure ground for excursions and picnics, and to maintain two dams on the river so as to keep up the pond above for boating purposes by the purchaser. He conveyed the land sold, to the purchaser, reserving the right to keep and maintain the dams as they then existed, and the right to the free and uninterrupted use and enjoyment of the water power and other privileges for manufacturing purposes and otherwise, and the deed also contained a clause by which the grant was made subject to the terms and conditions of a lease to an ice company: *Held,* that the

right to maintain the dams and to use the water power thereby created was in no respect inconsistent with the duty of the grantor to keep them up for the benefit of his grantee. and that the clause making the deed subject to the lease to the ice company was inserted for the protection only of the rights of that company, and did not authorize the vendor to remove the dams.

6.  SAME—*appurtenances—pass by deed without the use of that word.* An easement appurtenant to land will pass by a conveyance, although the words "with the appurtenances," are not used. Those words will not enlarge the scope of the deed. Whatever is actually appurtenant to the land granted passes without those words.

7.  EASEMENT—*when created and passed by deed.* A party owned an island upon which he had two dams, which created a large pond adapted for boating purposes. He sold ten acres of the island to another, which were bought for the purpose of making the same a pleasure resort, and also agreed with the purchaser that the dams should never be so lowered as to interfere with the free use of the mill-pond for boating purposes, but his deed did not name appurtenances: *Held,* that the use of the pond for boating purposes was in the contemplation of the parties, and was actually so far necessary to the proper enjoyment of the land conveyed as to constitute an easement appurtenant to the land.

8.  ESTOPPEL—*of grantor or heir—to deny grantor's construction put on his deed or contract.* A party negotiating the sale of a part of an island, which was valuable for a pleasure ground by reason of two dams on the vendor's other lands, which thereby formed a pond for boating excursions, submitted to the purchaser a copy of a lease to which the grant was to be subject, and a draft of certain clauses he desired to have inserted in his deed, and when the question was raised by the purchaser whether under such deed the dams would be maintained, he replied that the dams should never be so lowered as to interfere with the free use of the pond for boating purposes, and upon this assurance the contract of sale was concluded, and the grounds fitted up, at great expense, as a pleasure resort: *Held,* that it would be grossly inequitable to allow the vendor or his heir to recede from the construction he thus placed on the deed he was to, and did afterward, execute.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Kankakee county; the Hon. N. J. PILLSBURY, Judge, presiding.

Mr. H. K. WHEELER, and Mr. JOHN TULEY, for the plaintiff in error.

Mr. W. H. LYFORD, for the defendant in error.

Mr. Chief Justice Bailey delivered the opinion of the Court:

This was a bill in chancery, brought by the Chicago and Eastern Illinois Railroad Company against the heirs at law of George W. Cass, deceased, and others, to restrain them from removing two dams in the Kankakee river at Momence, Kankakee county. There is very little if any controversy as to the facts, and so far as they are necessary to a proper understanding of the case, they are as follows:

The Kankakee river at Momence runs in a westerly direction, and at that point its channel is divided into two nearly equal parts by an island of considerable length. About forty years ago two dams were built in said river, one extending from the upper or easterly end of the island to the south bank of the river, and the other extending from the lower or westerly end of the island to the north bank of the river. By means of these dams the water on the north side and for a considerable distance above the island was maintained at a depth of some four or five feet. These dams were originally constructed for the purpose of furnishing water-power to a mill, but have not been used for that purpose for many years. Said dams have been maintained, however, and the beauty of the island, together with the facilities furnished by said dams for boating, have attracted many excursions, picnics and fishing parties during the summer season.

George W. Cass, in his lifetime, was the owner of some thirty thousand acres of land bordering on the Kankakee river, and lying easterly and north-easterly from Momence. This land is level, and to a great extent low and swampy, having its natural drainage into the river. Cass, for the purpose of securing control of the flow of water of the river and to prevent its being backed up by the closing of these dams, as is claimed, purchased a two-thirds interest in the dams, water-power and island in December, 1871, for the sum of $30,000, and in July, 1883, he purchased the remaining one-third for $6000.

On the 15th day of September, 1884, Cass executed to the Eugene Ice Company a lease by which, in consideration of certain rent, he demised to said company the ice privilege pertaining to the island, dam and mill property, and the exclusive right to cut and carry away ice from the mill-pond and that portion of the river lying adjacent to the island, said lease containing, among other things, the following provisions:

"It is further understood by and between the parties hereto, that the party of the second part, (the ice company), shall at its own cost and expense, rebuild or repair the dams across said river at Momence as follows: the dam at the upper end of the said island across the south channel of the river to be built or repaired in such manner as the party of the second part shall elect, and the dam across the north channel of said river shall be repaired and rebuilt so that it will be eighteen inches lower than the height of the present dam, that is, the comb of the dam as rebuilt or repaired, shall not be as high as the present comb by eighteen inches. And the said party of the second part shall so repair or reconstruct the said dam across the north channel of said river as to make an opening or chute in the central portion of said dam eighty feet in length, capable of being lowered sixty inches below the crest of the dam as rebuilt or repaired as above mentioned; and the said chute should be so constructed that it can be readily lowered or removed so as to allow the free passage of the water for a distance of eighty feet in length of the dam, at a level of sixty inches below the comb of the dam. It is further agreed that the said party of the second part shall have full control of the water in the pond formed by said dam and the ice thereon, from the first day of November in each year, until the breaking up of the ice in the spring, during the term hereby demised, and that the chute shall be kept open or lowered from the date of the breaking up of the ice in each year, until the first day of November following."

The complainant is a corporation owning and operating a railroad from Chicago, through Momence, to Danville, the line of its railroad crossing the island at Momence a few hundred feet above the lower dam. Said company had for several years been carrying excursion parties from various points along its line to said island, and in September, 1886, with a view to increasing its traffic and furnishing superior accommodations to excursionists, it entered into a negotiation with Cass for the purchase of the upper part of the island, comprising about ten acres of land. Cass was then a resident of the city of New York, and said negotiation was carried on wholly by correspondence between O. S. Lyford, the general manager of the company, and Cass.

The first letter was written by Lyford to Cass September 15, 1886, and in it Lyford said that if his company could secure said island at a reasonable price, it would like to put up some improvements on it in the spring to accomodate excursionists; that it was impossible to make any considerable use of the island unless such improvements were made, and inquiring if Cass would be willing to sell the island at a reasonable price for the purpose named, or lease it for an annual rental as long as it should be used for excursions or railroad purposes. Cass replied under date of September 18, 1886, saying that he would be very glad to arrange for a sale or lease of such portion of the island as was adapted to the purpose named; that he was sinking a well at the head of the island for drinking water, as picnic parties had been obliged to bring water from the village, which was found quite troublesome; that in a few days he would send proposition, etc.

September 21 he again wrote enclosing a map of the island, and saying that he would sell what he called Island Park, being about 110 rods of the eastern end of the island, for $5000, or lease it for ten years at an annual rental of $400, and a sum equal to one-half of the taxes on the whole island, and adding: "You are aware that this is a part of the mill property, the

dams and water-power still existing. In deeding Island Park if the sale is made, I would reserve the riparian and water right, as also the right to keep in repair or rebuild the dam at the head of the island."

Lyford replied, under date of September 29, 1886, suggesting the inclusion of a little additional ground, and saying: "Now, as to the value of the island property, aside from the water privilege, it seems to me it is no more than similar grounds in the neighborhood, say $100 per acre, which I am informed is as much as land can be sold for in that vicinity, which is equally desirable for building purposes. Any value above this for excursion grounds, of course, depends upon a large expenditure of money by the C. & E. I. or any other party using them for that purpose. * * * Of course we should be willing to have you reserve the right to enter the premises for re-building or repairing the dams, or any other purpose not interfering with the use of the grounds for excursions. * * * In order to give the grounds any value for excursion purposes, it is indispensable that the dams be kept up as at present, because if the dams are to be taken away, there would be no water in the time of excursions to make the grounds desirable."

The next letter was from Cass, bearing date October 1, 1886, in which Cass agreed to lay out a certain street so as to give access to a certain public bridge, and to secure to excursionists the right to fish below the dam; also answering as to the additional grounds asked for, and insisting that the price asked was reasonable, and saying further: "As you say, the dam will have to be maintained, but I have not asked you to contribute to the expense thereof which makes the rent I ask you the more reasonable. If you wish to purchase the fee of the land I might extend the boundary somewhat further west, but not so as to interfere with the mill privilege."

Lyford wrote again October 9 as follows: "While I can not but think the price of the island very large, yet we are

desirous of testing the grounds for excursion purposes, and prefer to purchase rather than to lease. Will you please state what is understood by the riparian rights which you reserve? The definition says, pertaining to a bank of a river, and if this right does not interfere in any way with the use of the grounds for our purposes, I am disposed to accept the proposition of $5000."

In reply to this letter, Cass wrote Lyford under date of October 12, inclosing a copy of his lease to the Eugene Ice Company, and also clauses which he wished to have inserted in the deed as follows:

"Reserving and excepting, however, from said grant, the right to own, keep and maintain a dam, as the same at present exists, from the head of said island across said river to the left bank thereof, and for that purpose said grantor shall have the right to enter upon said premises at all times whenever in his judgment it may be necessary to make repairs, rebuilding or replacements.

"It is further agreed between the parties hereto, that said grantor may own, keep and maintain a dam, as the same at present exists, from said island across said river to the right bank thereof. The intent and object of this reservation and covenant being, to retain in the grantor, his heirs and assigns, the free and unincumbered use and enjoyment of all the water-powers and other privileges for manufacturing purposes or otherwise, including the privilege of owning and appropriating to his own use the ice which may be formed on said river above said dam."

On receipt of this letter and enclosures Lyford wrote: "I see no objections to the conditions, or terms of the lease to the Eugene Ice Company, except that, in order to make the island valuable for excursions, it is necessary that the water should be kept up on the north branch of the river so that boats may be run during excursion seasons. I notice that the dam is so constructed that the water can be lowered five feet,

and if that is done, the north channel would be dry or nearly so, and no possibility of boating. How can this be arranged? Is it your intention to have the water lowered as indicated in the lease to the Eugene Ice Company during the summer season? If this can be made satisfactory, I shall be ready to accept the proposition for the sale on the terms mentioned in your previous letter, and as specified in my letter to you."

To this, Cass replied saying: "The dams were rebuilt so as to lower them in the spring of the year when the streams north are full, so as to draw the water rapidly from my lands which have been subject to overflow. During the summer I do not think that the water was ever more than one foot below the comb of the dams. During excursion season there is no objection to the water being kept to the comb of the dams; should there be, as there some times is, very high water in June, it might be necessary to lower the dam for a few days to carry off the surplus water, but never so as to interfere with the free use of the pool or mill-pond for boating purposes."

Lyford then wrote, under date of October 21, 1886: "Yours of the 16th inst. is at hand and is perfectly satisfactory." Then follow certain suggestions as to the execution of the conveyance.

A deed was thereupon executed by Cass and wife to the railroad company conveying said property and forwarded by Cass to Lyford, but it being objected by the general solicitor of the company that it was not in accordance with the statute of Illinois, it was returned to Cass with a new deed drafted according to the Illinois statutory form. This deed was duly executed by Cass and wife and returned to Lyford. Said deed conveyed and warranted to said railroad company all of said island lying east of a line particularly described, and then contained the provisions a draft of which was sent by Cass to Lyford in his letter of October 12, as above set forth, and also the following:

"It is also agreed that this grant is taken subject to the terms and conditions of a certain contract made between the said George W. Cass and the Eugene Ice Company, dated the 15th day of September, 1884, a copy of which is hereto annexed." Annexed to said deed was a copy of the lease to said ice company.

In the spring following the execution of said deed, the railroad company commenced the erection of various buildings on the island, and placed a large number of pleasure boats on the river, and otherwise beautified the island, so as to attract pleasure-seekers. The evidence tends to show that it expended in this way about $12,000, in addition to the $5000 paid to Cass for said premises. The evidence also tends to show that the company made an outlay of from $30,000 to $40,000 for excursion cars to carry excursionists from Chicago to the island. Said dams were maintained during the summers of 1887, 1888 and 1889, and because of the improved carrying facilities of the company and the enhanced attractions of the place, upwards of 40,000 people were taken over the company's road during the months of June, July and August of those years. In the year 1889 Cass died, and his heirs at law came into possession of his real property at Momence, and also of large tracts of land above there bordering on the Kankakee river, situated mostly in the State of Indiana.

In the spring of 1890, certain of the heirs of Cass had an interview with the company's general manager in which they stated that they desired to excavate the rock in the river along the side of and above the island some three feet, in order to drain the lands of said heirs, as authorized by an act of the Legislature of the State of Indiana, and an appropriation of said Legislature made in aid of such improvement, and they claimed that for that purpose it would be necessary to entirely tear away the dams. Said general manager objected on the ground that to tear away the dams would render the entire property valueless to the company. Notwithstanding this ob-

jection, said heirs, sometime during the month of May, 1890, caused the removal of the chutes and thus turned out all of the water in the pond, thereby entirely destroying the facilities for boating. The railroad company thereupon replaced the chutes, and upon presentation of the present bill, obtained a temporary injunction restraining the Cass heirs from tearing down the dams or lowering the water on the north side of the island, and from interfering with the company or its agents in so repairing the dams as to keep the water on a level with the top of the comb.

After the bill was filed, it was dismissed, by agreement of the parties as to all the heirs of Cass except Mary C. Shelby, she having, since the death of her father, become the owner of the mill property and dams, and the lands adjacent to the river above.

The bill sets up the facts above stated, in substance, including the negotiations between the railroad company and Cass for the purchase of the island, and alleges that Cass, as the result of said negotiations entered into a valid agreement in writing, by which he bound himself, his heirs, etc., to keep and maintain the water in the river level with the comb of the dam, during the excursion season of each year perpetually, and also agreed that said dams should never be opened to such an extent as to interfere in any way with the free use of the river and mill-pond for boating purposes, and that such agreement was made with the intent on the part of Cass of persuading said company to purchase from him the island, for the use of excursionists, and to pay him $5000 therefor; that relying upon said written agreement, and the representations of Cass, and believing that they would be carried out, the company purchased said property of him and paid him $5000, said $5000 being the consideration for the conveyance of said property and of said agreement as to the maintenance of said dams.

The bill prays for an injunction restraining the defendants from interfering with or tearing down said dams, and from in any manner lowering the water in the Kankakee river north of the island below the level of the comb or top of the dams, and from preventing the railroad company from repairing said dams unlawfully torn down by the defendants, and a general prayer for relief.

The answer of Mary C. Shelby alleges, among other things, that the lands formerly owned by Cass bordering on the Kankakee river were swamp lands, and were very low, flat and wet, there being no way of draining them or of making them profitable except through said river; that Cass, realizing the importance of owning and controlling the dams at Momence, purchased the same as above stated. The answer admits the negotiations in relation to the purchase of a portion of said island by the railroad company, but denies the representations charged in the bill, and says that whatever contracts, representations or arrangements were made, if any, were finally merged in the deed executed by Cass and wife to the railroad company. It admits the execution of said deed, but sets up and relies upon the several provisions and conditions therein contained as above set forth.

The answer further alleges that, prior to the commencement of this suit, Mary C. Shelby had become the owner of eighty per cent of said 12,000 acres of land owned by Cass in his lifetime, and had a half interest in 5000 acres of other land in Illinois bordering on said river, which are greatly damaged by the closing up of said dams; that her sole purpose in obtaining control of said mill property was to use the same for the purpose of keeping the flood waters from submerging her lands adjacent to the river; that Cass, in his lifetime, purchased said property for the same purpose, and that the railroad company well knew, when it purchased a part of the island, that Cass did not part with his ownership or control of said dams, but expressly reserved the same, that he might

make use of them for the best interest of his lands bordering on the river.

The answer also sets up that the railroad company had no authority to maintain or operate picnic grounds, or to purchase or maintain dams across the Kankakee river.

The cause being heard in the Circuit Court on pleadings and proofs, a decree was entered dismissing the bill at the costs of the railroad company for want of equity. On appeal to the Appellate Court, said decree was reversed, and the cause was remanded to the Circuit Court, with directions to enter a decree restraining the destruction of said dams and the lowering of the chutes during excursion seasons, except in cases of high water, when they may be lowered sufficiently long to allow the surplus water above to run off, but never so as to interfere with the water above the dam for boating purposes. The present appeal is from the judgment of the Appellate Court.

The principal ground of contention on the part of Mary C. Shelby, the appellant in this court, is, that all the negotiations antecedent to or cotemporaneous with the execution of the deed conveying the easterly portion of the island to the railroad company, were merged in that instrument, and that said deed vested in the railroad company no right to have the dams maintained, but on the contrary, reserved to the grantor and his heirs the right to control and remove the dams as they might see fit.

It is claimed by the appellee, on the other hand, first, that the letters forming the correspondence between Cass and the appellee's general manager were not a mere negotiation but had ripened into a consummated contract, by which Cass, among other things, agreed to maintain the dams as they then existed, and not to allow the water therein to be drawn off so as to interfere with the use of the dams for boating purposes, and that the subsequent execution of the conveyance was but a partial execution of the contract, leaving the part in relation to the maintenance of the dams in full force and not merged

in the deed, and therefore still subject to specific execution by a decree of a court of equity. The appellee claims, in the second place, that if this view is incorrect, the deed itself, when properly construed in the light of the surrounding circumstances, conveyed to it the right to the perpetual use of the mill-pond as said pond existed at the time the deed was executed, and that the right to use it for boating purposes, and to have the water therein maintained at such stage as to render boating practicable during the season of summer excursions was an easement appurtenant to the property granted, and was therefore as much a part of the grant as was the land itself.

It may be observed that the bill is sufficiently broad to admit of the consideration of either of these contentions, as it not only sets up the deed and claims relief under it, but also alleges the antecedent contract, and asks for the enforcement of its provisions.

It can not be doubted that by the correspondence between Cass and the appellee's general manager, the minds of the parties met as to all the terms of the proposed purchase and sale of property, and that a binding executory contract, the consideration and provisions of which were all fixed and determined, was consummated. The description of the property to be conveyed, its price, the terms of payment, the character of the deed by which the conveyance was to be effected, and the nature of the title to be assured to the purchaser, were all agreed upon and the agreement was in writing. Not only is this so, but the most important element in the negotiation, and the one which formed the main inducement to the railroad company to make the purchase, and without which the purchase manifestly would not have been made, viz., the right to have the dams maintained, and to the use of the pond and river for boating purposes, was agreed upon and secured to the railroad company by the contract. At the time the deed was executed, none of these matters rested in mere negotia-

tion, but had received the assent of both parties, in such form as would doubtless have enabled either party to insist upon their specific performance.

The materiality and importance to the railroad company of the right to have the dams maintained is manifest throughout the entire negotiation. The only purpose for which the company sought to purchase the island was to fit it up as a resort for excursionists in summer and to make it such a resort, the maintenance in the pond and river of such stage of water as would render boating practicable was absolutely indispensable. From first to last the maintenance of the dams was insisted upon by the railroad company as a *sine qua non,* and there is no reason to suppose that upon any other basis it would have entertained for a moment the project of making the purchase. In fact, a very large proportion of the purchase money paid seems to have been in consideration of the boating privilege furnished by the pond and river. Apart from that, as the company insisted and as does not seem to have been denied, the land on the island was not worth more than farming lands in the vicinity, viz., $100 per acre, while the price agreed upon was about $500 per acre. The condition that the dams should be maintained which was insisted upon throughout by the railroad company, was fully and unqualifiedly acceded to by Cass, and when that was done, Cass' offer was accepted and the bargain struck.

We are of the opinion that, if the right to have the dams maintained did not pass to the railroad company by the deed as an appurtenance, the stipulation in the contract providing for their maintenance was not and was not intended to be executed by the conveyance, and therefore was not merged in the deed. If it was not in the nature of an easement appurtenant to the land, it was a collateral right secured by the contract, and not being covered by the deed, was not affected by it.

But it is urged that certain provisions of the deed are inconsistent with the continued existence of the stipulation in

relation to the maintenance of the dams, and that, as a consequence, such stipulation must be deemed to be merged in or superseded by the deed. If an enforcement of the technical doctrine of merger necessarily involves consequences of this character, its enforcement, under the circumstances here shown, will not be favored, and will be admitted only in case of the failure of every rule of interpretation tending to a contrary result.

Manifestly, a deed merely conveying from Cass to the railroad company the land comprising the upper part of the island, would in no degree be inconsistent with the right on the part of the railroad company to have the dams maintained and to use the pond and river for boating purposes. But it is said that the clause in the deed by which the grantor retained the right to keep and maintain said dams as they then existed, and the right to the free and uninterrupted use and enjoyment of the water-power and other privileges for manufacturing purposes and otherwise, and especially the clause by which the grant was made subject to the terms and conditions of the lease from Cass to the Eugene Ice·Company, had the effect of a reservation of the right to open the dams and draw off the water during the summer season, and so was inconsistent with the right to have the dams maintained during the same portions of the year.

So far as the first of these clauses is concerned, it is clear that the right to maintain the dams and to use and enjoy the water-power thereby created is in no respect inconsistent with the duty of keeping them up which Cass imposed upon himself by his contract. Nor do we see anything in the clause making the deed subject to the provisions of the lease to the ice company which necessitates a different result. That clause was inserted for the protection of the rights demised to the ice company, but not of the rights reserved to Cass out of the demise by way of exception, or, in other words, they were inserted to give force to the provisions in the lease for the benefit

of the ice company, but not to those inserted for the benefit of the lessor. The former Cass had no power to grant away or modify by his deed, while the latter were absolutely at his disposal. The maintenance of the dam during the ice season was clearly for the benefit of the ice company, for that was necessary to the formation of ice on the pond, but whether the dam should be kept open or closed during the summer was a matter about which the ice company had no concern. The provision for lowering the dam during that period was solely for the benefit of the lessor, and was a matter which he was at liberty to waive. Certainly, in view of his waiver of such right by his contract to keep the chute closed in summer, the clause making the deed subject to the lease will not be interpreted as making the deed subject to those provisions which were inserted in the lease for the grantor's sole benefit, and which he had the power to and had expressly waived.

If it were necessary to that end, the doctrine of estoppel might be properly invoked. It will be remembered that after Cass had submitted to the railroad company a copy of the lease and a draft of the clauses now under consideration which he desired to have inserted in the deed, the question was raised by the company whether under such deed the dam would be maintained during the summer, and that Cass replied that the dam should never be lowered so as to interfere with the free use of the mill-pond for boating purposes. Upon this assurance, the contract was concluded and the deed executed with the proposed clauses inserted therein. Cass thus put upon the deed which he proposed to execute an interpretation, which does no violence to its terms, and from which it would now be grossly inequitable to allow him or his legal representatives to recede.

What we have said thus far is upon the theory that the right to have the dams maintained did not pass to the railroad company by the deed, but we are inclined to the opinion that said right constituted an easement appurtenant to the land, and as

such passed by the conveyance. It is true the words, "with the appurtenances," or equivalent words, were not employed in the deed, but those words, if used, would not have enlarged the scope of the deed, for what is actually appurtenant to the land granted passes without such words, it being the general rule that whatever is in use for the land as an incident or appurtenance, passes by a conveyance of the land. *Hattemieer* v. *Albro*, 18 N. Y. 48. We think the use of the pond for boating purposes was, in the contemplation of the parties, and was actually, so far necessary to the proper enjoyment of the land conveyed, as to come within the definition of an appurtenance. At least, under all the circumstances disclosed by the evidence, Cass and his legal representatives should be held to be estopped to deny the existence of such easement, and that it passed to the company by the deed as appurtenant to the land conveyed.

The defense that the purchase of the island and the establishment thereon of a resort for excursionists was *ultra vires* is without merit. Even if it were true that these matters were beyond the powers granted to the railroad company by its charter—a question as to which we express no opinion—neither Cass nor his legal representative is in a position to allege that defense, or take advantage of it for the purpose of escaping from the obligations of a contract entered into with the railroad company, upon a valuable and adequate consideration. They will not be permitted to retain the consideration and at the same time repudiate the contract upon which they received it.

In our opinion, the judgment of the Appellate Court is just and proper, and it will accordingly be affirmed.

*Judgment affirmed.*