JASPER CAREY et al., Appellees, v. SAMUEL WALKER et al., Appellants.

**DEEDS:** Construction—Merger of Prior Contract of Purchase. A
1 deed, in the ordinary form, made and delivered in compliance with a former contract of purchase and sale, does not merge the terms of such former contract in so far as such terms give to the pur-

chaser rights collateral to and independent of the conveyance. Such terms may be shown and enforced irrespective of the deed.

PRINCIPLE APPLIED: Plaintiffs, in writing, agreed to buy, and defendant to sell, on certain deferred payments, an existing coal mine. A part of the contract gave to plaintiff the right to take water from a pond on adjacent land belonging to defendant, for use in plaintiffs' engines. Payments for the land were made and defendant delivered to plaintiffs a deed, in the ordinary form. Later, controversy arose as to the right of plaintiffs to take water from the pond. *Held*, the contract for water rights was collateral and independent of the deed and could be shown and enforced.

WATERS AND WATERCOURSES: Contract—Evidence—Sufficiency.
2   Evidence reviewed and held sufficient to establish a contract for certain water rights.

ESTOPPEL: Equitable Estoppel—Evidence—Sufficiency.   Evidence
3   reviewed and held insufficient to show that plaintiffs were estopped by their conduct to insist on certain water rights.

*Appeal from Wayne District Court.*—HON. H. K. EVANS, Judge.

WEDNESDAY, OCTOBER 20, 1915.

ACTION to enjoin the defendants from cutting a certain pipe connecting plaintiffs' mine with a pond upon defendants' land, through which water was furnished to the plaintiffs for the operation of the mine. The opinion states the facts. Decree for the plaintiffs. Defendants appeal.—*Affirmed.*

*Miles & Steele,* for appellees.

*Poston & Murrow,* for appellants.

GAYNOR, J.—This action is brought by the plaintiffs to enjoin the defendants from cutting a water pipe leading from a pond on the land owned by the defendant Covil to a coal mine on plaintiffs' land, and from interfering with plaintiffs' right to pipe water from said pond for use on plaintiffs' land.

The plaintiffs claim that, on or about the 24th day of March, 1906, the plaintiffs, Jasper Carey and one R. E. Carey,

made a contract in writing with the defendant Walker for the purchase of the following described property: The W ½ of the N W ¼ of the N W ¼ of Section 3, Township 67, Range 20 North of 5th P. M., in Wayne county, with the coal shaft, all machinery, scales, buildings then on said land, and also the right to pipe onto said land water from a pond located then and now located on the E ½ of the N W ¼ of the N W ¼ of said Section 3; that, ever since the making of said contract, the plaintiffs have been exercising the right and privilege granted them in said contract to pipe water from said pond onto said land in accordance with the provisions of said contract; that, on or about February or March, 1912, defendant Walker sold the aforesaid E ½ of the N W ¼ of the N W ¼, on which the pond was located, to the defendant Ed Covil; that, at the time Covil purchased the land, he had actual and full knowledge and notice of the rights of these plaintiffs under said contract; that plaintiffs are now the owners of the W ½ of the N W ¼ of the N W ¼ of said section, and of the aforesaid coal shaft, and they expect and intend to continue the operation of said coal mine for an indefinite period; that the defendants have threatened to cut the aforesaid pipe so as to prevent them from piping and securing water from said pond, and unless enjoined and restrained by the court, they will do so and prevent these plaintiffs from piping and obtaining water from said pond for use on said land in the operation of their engine used in connection with the operation of the coal mine.

Plaintiffs further say that they were largely induced to purchase the said land from the defendant Walker on account of the aforesaid coal mine; that the coal mine was the leading practical inducement that caused them to purchase said land from the defendant Walker; that, in purchasing said land, they relied on a contract and agreement with Walker aforesaid that plaintiffs should have the right to pipe water from said pond in the use and operation of their mine, and, if it had not been for said water right, plaintiffs would not have

purchased the land from Walker; that, in making the purchase, these plaintiffs relied upon said water right and were thereby induced to make the purchase; and that said water right is of great value to these plaintiffs, and, without the right to pipe and use the water from said pond, the said mine would be practically valueless to these plaintiffs and they would not be able to successfully operate it. That, on or about the year 1909, the plaintiff, W. H. Thomas, purchased the undivided one half of the land aforesaid from R. E. Carey.

The contract referred to in plaintiffs' petition and relied upon to secure the relief prayed for is, so far as material to this case, as follows, and is hereafter called Exhibit A:

"The party of the first part hereby agrees to sell to the party of the second part, on the performance of the agreements of the party of the second part, as hereinafter mentioned, all his right, title and interest in and to the real estate situated in the county of Wayne and state of Iowa, to wit: The west half of the northwest quarter of the northwest quarter of section 3, township 67, range 20, together with coal shaft and all machinery, scales and all buildings now on said land. Second party agrees to keep the water pumped out of shaft at least once a week and to keep shaft and buildings all in good repair and turn over all bulletins directly after each pay day, for the sum of thirty-five hundred dollars, payable as hereinafter mentioned. And the said party of the second part, in consideration of the premises hereby agrees to and with the party of the first part, to purchase all his right, title and interest in and to the real estate above described for the sum of thirty-five hundred dollars, and to pay said sum therefor to the party of the first part, his heirs or assigns, as follows: Five hundred dollars, on the execution of this agreement, and the balance of thirty hundred dollars as follows, to wit: To pay 2c a bushel on all coal sold from mine, said coal to be weighed on wagon scales, said payments to be made promptly every two weeks the day before pay day until

the whole amount is paid, together with interest from this date at the rate of 8% per annum on all such sums as shall remain unpaid, payable annually till all is paid.

"Witness our hands, the day and year above written.

"Samuel Walker,

"R. E. Carey,

"Jasper Carey.

"Slip attached to Exhibit A.

"Said first party agrees that second party is to have water from said first party's pond west of barn for to run their engine with as long as there is water in said pond, second party to be at all expense of piping or any other expense in getting water to mine. Said water to be piped from pond. Second party agrees that first party shall have privilege to water his stock at mine in lieu of water furnished second party from pond. It is further agreed that when second party puts in his line fence hog tight, first party will put in his share, and also put in a line fence from east line to mine for watering stock, said lane to be forty feet wide."

The defendants file separate answers.

Defendant Walker, in answer, admits that he entered into a contract with R. E. Carey and Jasper Carey on or about the 24th day of March, 1906, and that Exhibit A is a true copy of the contract, except that portion wherein it is agreed that the second party is to have water from first party's pond west of the barn to run their engine with as long as there is water in said pond, which appears to be attached to said contract, and says that that portion was no part of the contract; never was agreed to by the defendants; was not attached to the contract with the knowledge or consent of the defendant. He further alleges that, in pursuance

of said contract, he did, on the 9th day of January, 1909, execute and deliver to said Jasper and Jacob H. Carey a warranty deed for the premises; that, by reason of the execution and delivery of said deed and its acceptance, the said contract was merged therein, and was wholly performed by the defendant and extinguished. He further says that he has no interest in the premises now. He denies each and every other allegation of plaintiffs' petition.

The defendant Ed Covil, for answer, also denies the allegations of plaintiffs' petition, except that he admits that he purchased the east half of the northwest quarter of the northwest quarter of section 3, from the defendant Walker; admits that he is now the owner of said lands and denies that the plaintiffs have any right therein as alleged in their petition; denies that he ever had any notice or knowledge of the contract alleged to have been entered into between plaintiffs and the defendant Walker, as alleged.

Covil further answering says that, prior to purchasing the east half of the northwest quarter of the northwest quarter of section 3, his attention was called to the water pipe running from the pond on said real estate across said land and across the land of the plaintiffs to the coal mine located thereon; that he, with Walker, went to one of the plaintiffs and told said plaintiff that Walker was negotiating a sale of this land to Covil, and that the portion of the pipe situated on the land of the plaintiffs belonged to the plaintiffs, and the portion situated on the land of defendant Samuel Walker, belonged to the defendant, Samuel Walker; that plaintiffs had no right to or interest in said pond or to that portion of the water pipe situated as aforesaid; that, should a sale of said land be made to this defendant Covil, plaintiffs' right to take water from said pond or to use the pipe leading therefrom would be by sufferance and permission of said defendants; that plaintiff interposed no objection to the statement, but, on the contrary, indicated approval of all that was said as above set forth; that, relying upon said conversation, the

defendant completed the negotiations with the said Samuel Walker, and is now the owner of said land; that he would not have purchased said land had it not been for said conversation; that, by reason of the foregoing, the plaintiffs are estopped from having or making any claim to said pipe line, and from claiming any right to the water from the pond on said land, or in any way objecting to the right of the defendants to cut said pipe line between the land of the plaintiffs and these defendants.

Upon the issues thus tendered, evidence was introduced and the cause submitted. Upon such submission, the court adjudged and decreed the issues in favor of the plaintiffs and entered a decree perpetually and permanently enjoining and restraining the defendants from cutting or in any manner interfering with the pipe and pipe line extending from the pond located on the east half of the northwest quarter of the northwest quarter of section 3, and running and extending under and beneath the ground to the steam boiler, engine, machinery and equipment, situated and located on the west half of the northwest quarter of the northwest quarter of section 3, and from, in any manner, interfering with the drawing, receiving and using of water from said pond through said pipe for use in plaintiffs' boiler and engine. From this decree, defendants appeal.

This is a fact case and triable *de novo* here. Two questions are in dispute: (1) Was the slip hereinbefore set out as a part of Exhibit A attached to and a part of the said contract at the time of its execution? Does it evidence a part of the contract and a part consideration for the agreements made by plaintiffs? (2) If it was and does, are the plaintiffs, by reason of their conduct, now estopped from asserting it as against the defendants?

The burden of proof is on the plaintiffs to establish the first proposition. If they have failed, the controversy ends there. If the plaintiffs have established the first proposition, the burden of proof rests on the defendants to establish the

second. If they have failed in this, then, the first proposition being established, plaintiffs' contention must prevail.

We are met at the threshold of our investigation with the proposition that, inasmuch as Walker subsequently executed and delivered to plaintiffs a warranty deed to the property described in the contract, the contract, with the slip attached, became merged in the deed; that, as the deed was made in consummation and fulfilment of the contract, the contract, with all its provisions, became merged in the deed and thereafter had no binding force and effect upon the parties or upon their rights. We will dispose of this question first, before proceeding to a determination of the two questions above set out.

1. DEEDS: con-
struction:
merger of prior
contract of
purchase.

The contention of the defendants—that the original contract relied upon by the plaintiffs, with all its provisions, became merged in the deed—must be answered in the negative. There is no evidence upon which any merger could be based, except the mere fact that, in pursuance of the contract, the defendant Walker subsequently executed and delivered to the plaintiffs a warranty deed to the property therein described. The deed simply evidenced the consummation of that part of the contract by which it was agreed that, upon certain conditions, the legal title would be transferred to the plaintiffs. The portion of the contract sought to be enforced does not alter, change or vary any of the provisions of the deed. By the deed, the defendants simply executed that portion of the contract which called for a deed upon the payment of a certain sum of money. The contract in dispute is one that the courts will recognize and enforce, independent of the execution of the deed,—one that the courts would recognize and enforce if no deed were made. It relates rather to a consideration or inducement leading to the contract itself. A contract for a deed antedates the execution of the deed, and may and often does contain many provisions which the execution of the deed neither adds to nor takes away. If plaintiffs' con-

tention is true, and this contract was actually made, the execution of the deed was a part performance only of the contract on the part of the defendants. This deed is in the ordinary form, contains only the ordinary covenants, conveys the title to the land purchased, but does not deal with or attempt to deal with the collateral agreement by which plaintiffs secured the rights in controversy—rights essential to the full enjoyment of the thing conveyed.

We must not be understood as holding that, where the right claimed would vary, change, or alter the agreement in the deed itself, or inheres in the very subject-matter with which the deed deals, a prior contract covering the same subject-matter can be shown as against the provisions of the deed; but we do hold that, where a contract provides for the conveyance of the real estate upon the payment of a certain sum, and gives to the purchaser certain rights, collateral to and independent of the conveyance, the making of the deed does not merge the collateral or independent agreement into the deed so that they cannot be shown and enforced. Upon this point see *Sutcliffe v. Pence*, 156 Iowa 643; *Saville v. Chalmers*, 76 Iowa 325; *Trayer v. Reeder*, 45 Iowa 272; *Taylor v. White River Valley R. Co.*, (S. D.) 132 N. W. 152; *Shelby v. Chicago & E. I. R. Co.*, 32 N. E. 438; *Green v. Batson*, 71 Wis. 54. See, also, *Wilson v. Wilson*, (Mo.) 92 S. W. 145.

We come now to a consideration of the evidence offered in support of the several contentions of the parties touching the two propositions hereinbefore set out.

2. WATERS AND WATERCOURSES: contract: evidence: sufficiency. An examination of this record discloses the fact that there is a sharp conflict between the parties as to the first proposition: Was the slip that appears attached to Exhibit A a part of the original contract entered into between the parties?

If we were confined to the verbal testimony of these witnesses which negatives or affirms the fact, we might not be able to reach a satisfactory conclusion on the propositions submit-

ted. We go, therefore, to the entire record, and find that, at the time this contract was made, Walker was the owner of both pieces of land; that upon the piece of land conveyed to the plaintiff, he had and was operating a coal mine; that he had been operating it for several years before this contract was entered into; that on the land conveyed to Covil he had a pond of water which was piped to connect with this mine; that this pond and this water had been used for years by the defendant in operating the mine; that there was no other supply of water for the mine; that water was necessary for the purpose of operating the mine; that both parties knew these facts at the time; that without water the mine could not be operated; that there was no water on the land conveyed to the plaintiff from which water for the mine could be secured; that the pipes that connected this pond with the mine were under ground; that they did not interfere with the surface of the ground or defendant's use; that the ground under which they were laid was and had been used for pasture; that, at the time the contract was entered into, it was contemplated by both parties that the mine should be operated; that the contract itself provides for the operation of the mine; that the land, independent of the mine, was not worth nearly the amount agreed to be paid; that the consideration was to be paid out of the operation of the mine—2c a bushel on all coal sold from mine, to be paid promptly every two weeks until the consideration is paid.

It is not disputed that the plaintiffs and the defendants talk about this supply of water. While the defendant denies that this slip was a part of the contract, denies that he knew anything of this writing attached to the contract known as the slip, yet he says:

"When I made the deal, the boys were to get water from the pond for the engine. I aimed for them to get water there, for I would rather they would use that kind of water. I desired that they use that kind of water as long as they owed

me, because I had an interest on both sides. They were to use the water from the pond *until they got me paid up.* It wasn't necessary to put this in the written contract. They were to use water until I was paid up. I didn't put it in the contract that they were to use water out of the pond, because I thought verbally was sufficient. The reason why I didn't put it in the contract was, I didn't expect them to use it forever.''

Testifying regarding this paper, he said:

''Exhibit A is the contract entered into for the sale of the land, except the slip does not belong there. There was no slip when I signed it. There was nothing in the contract that I signed that Careys were to have water from the pond as long as there was water in the pond. They never asked me for a water contract. Before we entered into the contract, I told them they could get water out of the pond, but there was nothing in the written contract. After the written contract was made, they made a different proposition about the water. I told them that as long as there was plenty of water in the pond they could use it. If it got low, of course I did not expect to cheat myself of the water.''

Independent of the testimony of the parties, we have in the record the testimony of W. F. Wharton who appears to be a wholly disinterested party, and who testified as follows:

''Live at Seymour; business rural mail carrier; lived at Seymour about eighteen years; had an office in Seymour in March, 1916; was acquainted with Sam Walker; have known him for about fifteen years; knew Jasper Carey and R. E. Carey; they were in my office on March 24, 1906; I wrote the contract Exhibit A; the piece attached is my own writing; I remember writing the contract; the piece was attached to the contract the same day it was written; was attached and made a part of the contract at the time it was signed by

Samuel Walker, I am quite sure. I would say it was on the contract when it was signed.''

We have not attempted to set out all the evidence, but will say that the reading of the entire record convinces us that the great preponderance of the evidence is in favor of plaintiffs' contention, and the court did not err in holding the slip attached to the contract a part of the contract, and binding on the defendant Walker.

This brings us to a consideration of the second proposition. On this proposition, there is a square conflict between the witnesses as to the fact upon which defendants predicate their estoppel. The writing having been proven and rights having been acquired by plaintiffs under the contract, the burden rests on the defendants to show that conduct of plaintiffs was such that they are now estopped to insist upon the writing as against the defendants. Upon this point, defendant Walker testifies:

3. ESTOPPEL :
equitable es-
toppel : evi-
dence.: suffi-
ciency.

''When I contemplated making this sale to Covil, myself and my son went to see Mr. Jasper Carey. We met him at the mine. I told him I guessed I had a chance to sell the farm; that if I did, I wanted him to have a fair understanding about the water pipe, and I told him that if I should sell it, it would be 'him and Mr. Covil, and not me about the water.' I says, 'Mr. Covil can cut you off there, or later he can let you have water if he wants to as that will be nothing to me.' Mr. Carey says, 'All right, go ahead.' Never said anything about the contract under which he claims now. He never claimed that Mr. Covil could not cut him off when he wanted to. If Mr. Carey had told me at that time that he was claiming a right to use this water in this pond for his engine, as long as there was water in the pond, and I could not cut him off, I never would have negotiated and made a warranty deed to Mr. Covil until I had straightened it up. I took Mr. Covil

and went over to see Mr. Carey because they were using the water, and I wanted him to understand that he was getting water there. I did the talking with Carey. Covil did not say anything to him, and he did not say anything to Covil, but Covil was there when he said it would be all right, to go ahead. Mr. Carey was hoisting coal at the time. The mine was in operation; he was pretty busy; I called him away from his work. It occurred in the engine room. We talked to him about two or three minutes. After I made the deed to Covil, I told him to go ahead and use the water the same as he had been. I did not go to Carey. I told Covil to cut the pipe if he wanted to so that Carey could not get the water.''

Covil testifies, in speaking of this visit to Carey:

''Walker went in there and told him I was looking over the place and thinking of buying it. He told him that if I bought the place, all that was on the east side of the fence belonged to me, and what was on the west side belonged to Carey, and the water pipe was to be cut at the line fence. That was what Mr. Walker said to him in my presence. Mr. Carey made no objections, nor did he make any claim that he had a right to use the water as long as there was water in the pond, and did not claim to have any contract to do so. If he had told me this, I would not have bought the farm.''

The son testified substantially the same as the father as to the conversation between Carey and the defendant Walker at the mine.

Carey testified on this point:

''I never had any such conversation there, nor did I hear him make any such statements to me that day, either outside, or at the door of the engine house or at any place. I remember they came there that day. There was never any such conversation took place in there that I know of. I never at any time or place, by act, word or otherwise, waived or

intended to waive my rights under this contract for the use of water from the pond to operate the mine. If I had heard Mr. Walker or had known that Mr. Walker was trying to get from me a statement that I had no rights there, I would have made objection. The only talks I heard at that time on the part of Mr. Walker was: 'He said he sold his farm, and what was on my side of the fence belonged to me and what was on the other side of the fence belonged to him' (meaning the defendant Covil). That was all I heard.''

We are concerned with the reasonableness of the contention of these defendants. Plaintiffs had secured and had been enjoying a valuable right. Defendants say that, without any consideration, without the least equivocation or hesitation, they voluntarily surrendered these rights to the defendants, although at the time they were operating the mine, and water from this pond at that time was absolutely essential to the continuation of the operation. If the contention of the defendants is true, they could, within five minutes after the conversation, have cut these pipes, and, by so doing, have closed down the mine, and this without any objection on the part of the plaintiffs thereto,—in fact, by their active consent.

In every legal controversy, the ultimate fact sought to be established or proven by the evidence or the evidentiary facts must be kept clearly before the mind. On the very threshold of the investigation, the mind of the trier must have and hold in its possession and before the mind's eye, the ultimate fact in dispute. The investigation starts from this point. With this in view, the issues are framed. For this purpose, each party is required to state what he claims the ultimate fact to be. The evidence then is offered for the purpose of satisfying the mind of the trier as to what the ultimate fact is. The mind is called upon to search for the truth, to ascertain and state it. To this end, the evidence is offered. The evidence must be competent, relevant and material. It must have some probative force as to the existence or nonexistence of the disputed

fact. The fact exists, or does not exist, independent of the evidence which may be offered to establish its existence or nonexistence. The trier then is charged with the duty of weighing this evidence. Therein comes the rule of reason.

To this end, the trier of fact considers not only the testimony of the witnesses who were sworn and examined, but all facts upon the trial which have evidentiary value in establishing the existence or nonexistence of the disputed fact. Where witnesses are called who know, or ought to know, what the ultimate fact is, and, so far as the record shows, are equally credible, one affirming and the other denying the existence of the fact, the mind might be left in doubt, and, therefore, could not reach a satisfactory conclusion as to the existence or nonexistence of the fact. With the mind in this condition, of course, the one who has the burden of proving the existence of the fact must fail; for, until the fact upon which he predicates his right to affirmative relief is proven to the satisfaction of the mind of the trier, no relief can be granted him.

The testimony of the witnesses offered on either side may not be reconciled; may be so diametrically opposed to each other that the mind at once reaches the conclusion that both statements cannot be true. The mind then turns to the whole record,—to the facts and circumstances attending the transaction in controversy,—to the reasonableness or unreasonableness of the stories told,—and searches for the truth in the record of undisputed or proven facts: this for the purpose of aiding the mind in reaching a conclusion as to which of the two parties, by his testimony, has disclosed the ultimate fact in all its fullness and truth. Thereupon, the mind weighs and balances the probabilities, the reasonableness or unreasonableness of the stories told; reviews the conduct of the parties touching the subject-matter out of which the controversy arose; considers the relationship of the parties to the subject-matter and to each other, and every fact and circumstance disclosed by the evidence which tends to sustain or contradict

the several contentions; and therein may find a guide to the truth.

Men are presumed to act with an intelligent regard to their own interest. This, of course, is not always true, but it is generally true. Men, as a rule, do not surrender valuable rights secured, voluntarily and without consideration. This is especially true when the rights are essential to the enjoyment of the thing purchased and paid for. Where a thing purchased and paid for has a value only by reason of the right secured, and it appears that the right secured is essential to its full enjoyment, it takes a strong showing to satisfy the mind that a party having the right so essential to the enjoyment of the thing purchased surrendered or abandoned it voluntarily and without consideration.

Defendants' contention does not appeal to reason, nor does it comport with that conduct which men of ordinary intelligence indulge in when valuable rights are called into question. Upon this point, we think, too, the court rightly held that the defendants had not carried their burden to a successful issue, and that no estoppel was in fact shown.

With these two findings adverse to the defendants' contention, the court did not err in entering its decree, and the case is therefore—*Affirmed.*

DEEMER, C. J., and SALINGER, J., concur; LADD, J., concurs in result.