SULA DAWSON, Appellant, v. C. L. McKINNON et al., Appellees.

No. 44606.

APRIL 4, 1939.

REHEARING DENIED JUNE 23, 1939.

Alan Loth, for appellant.

Fred D. Everett, Attorney General, G. H. Clark, Asst. Attorney General, D. M. Kelleher, and Horace J. Melton, for appellees.

BLISS, J.—The issues in this suit are largely of fact. A number of exhibits used in the trial below, consisting of plats, blue prints, and other documentary records, have been certified to us. In order to present a clearer view of the controversy, we have prepared composite plat from the various blueprints, and supplemented it from the oral testimony introduced. The top of the plat is to the north. The location of the property is in the city of Fort Dodge, Iowa. A rather detailed statement of the facts is necessary for an understanding of the matters involved.

Almost all of the property, shown on the plat, was at one time owned by John F. Duncombe. To a considerable extent much of the property constituted the grounds about his residence, which is indicated by the solid rectangular drawing at the lower end of the rounded portion, surrounded by "Fair Oaks Drive". After the death of Duncombe, the property shown on the plat passed to those who will be referred to herein as

the "Duncombe heirs". During the ownership of Duncombe and his heirs, the property was not platted or subdivided into lots, as shown on the plat. It was largely timber, and during his lifetime, a part of it had been used as a park for deer. On the north it was, and is, bounded by "4th Avenue South", on the west by "8th St.", and on the east by "12th St." Ninth and Tenth streets had been laid out and opened prior to that time, but neither extended south of Fourth avenue. The Duncombe property, being the part south of Fourth avenue, was not platted until in 1922. Prior to the platting in 1922 and for several years thereafter, the only access to the Duncombe residence, outbuildings, and immediately contiguous grounds, was a private drive or driveway which entered the Duncombe property from Fourth avenue south, directly south of Ninth street, and continued in a southerly direction, as indicated by "Fair Oaks Drive", curving around to the west, south, and east of the Duncombe house, and stopping at about the south line of what is shown as lot 24 on the plat. All north of the latter line, along what appears on the plat as an extension of Tenth street, was timber, and if it was possible to drive through it, it was only by winding among the trees, until the Gorman property was reached. The only other residence in the entire tract, except the Duncombe home, which was immediately south of it, across the drive, in the rectangular lot, marked "Nettie Hull Duncombe", on the plat, was the Gorman home on lot 27. The Duncombe horse stable was across the drive at about what is shown as lot 22 on the plat.

On May 26, 1921, the Duncombe heirs, as vendors, entered into a written contract with Sula Dawson, the appellant, by which, for a consideration of $7,500, they sold to her the old Duncombe residence, and immediate grounds, described as follows:

"Beginning at a point 342 south of the southwest corner of Block 39, East Fort Dodge Addition to Fort Dodge, Iowa, measured along the line of 9th street extended, thence angleing to the left 87 degrees, 240 feet, thence angleing to the right 90 degrees, 18 feet, thence angleing to the right 56 degrees, 24 minutes, 137 feet, thence angleing to the right 15 degrees, 69 feet, thence angleing to the right 28 degrees, 50 feet, thence angleing to the right 24 degrees, 100 feet, thence angleing to

the right 24 degrees, 79.2 feet, thence angleing to the right 126 degrees, 58 minutes, 125 feet to place of beginning.''

The contract contained the following provision:

''Parties of the first part (Duncombes) also, in said deed, will grant an easement to the party of the second part, heirs, grantees and assigns, of the right of ingress and egress to the above described property on the driveway now existing from 9th street in the city of Fort Dodge, Iowa, to the property above described, the exact description covered by the said easement to be obtained and become a part of the deed above described.''

On examining the plat, it will be noted that the tract conveyed is an approximate segment of a circle, containing the Duncombe home, and that the chord of the segment is the north boundary line of the tract. The north line is 365 feet long, and the greatest width of the segment is about 120 feet.

The deed was executed and acknowledged by the vendors, on May 26, 1921, the day of the execution of the contract, but through some inadvertence, or undisclosed reason, the exact description of the easement was not inserted in the deed. The appellant began at once to repair and improve the property, and a little later, in the fall of 1921, moved into the home. Thereafter, and on December 8, 1921, the deed was placed on record.

At the time the appellant purchased the property it did not abut upon any public street, highway, or alley, and it could not be reached by any such public way. The only access to this tract was the private drive from Fourth avenue south, as heretofore stated and described. So far as the record discloses, this had been the situation since the home was built. From this private drive there were three entrances into the tract purchased. One was the front entrance, west of the house, and on the west boundary line. It is the curved indentation of that boundary, whose opening is marked by the letters ''B'' and ''C'', and whose rear, or eastmost extremity is marked by the letter ''A''. At ''A'' there was, and had been, a stone or cement block to facilitate mounting, and alighting from, horses and vehicles. The vehicle would enter at ''C'', circle around past ''A'', and re-enter the drive at ''B''. There was a carriage stand at the rear or east entrance to the residence, which was reached from the

drive by the driveway coming up to the rear of the house. The appellant made this cariage stand into the square garage attached to the rear of the house, and shown on the plat. There was also a third entry from the drive into the tract purchased by the appellant. This entrance was off the drive, to the north and east of the entrance to the carriage stand at the rear of the house. This driveway led from the entrance on the drive and passed on to the north of the house. It was used in hauling coal to the bins. From the testimony of the appellant's husband, this entrance and driveway were located about as shown on the plat. In 1923 the appellant built a stone wall, about two feet ten inches high, from the southeast corner of the house, southeast along the west boundary of the rear driveway, and then along the south boundary of the property up almost to the point ''C'' of the west entrance. All of these three entrances and driveways, and the drive from Fourth avenue to the northwest corner of the property, and along the south line and to the northeast corner of it, were in existence when the appellant bought the property. At that time they were laid out, and were being used, and were well-traveled ways. The outside drive from Fourth street clear around the property to the east end was thirty feet in width and used to the full width. All of these matters are testified to by the appellant's husband, and it was stipulated that the appellant would give the same testimony. No witness testifies to the contrary.

On February 13, 1922, the Duncombe heirs filed a plat and dedication of the Duncombe property, excepting therefrom the appellant's property, the Mary Kenyon property, the Nettie Hull Duncombe property, the C. M. Duncombe, and other properties. The appellant did not join in the plat or dedication, and did not know of it. ''Fair Oaks Drive'' was laid out on this plat to include the old private Duncombe drive, from Fourth avenue to and around the appellant's property, and was then extended in a northerly direction until it joined with the intersection of Tenth street and Fourth avenue. It was marked on the plat as 35 feet wide at Ninth street and Fourth avenue, and as 30 feet wide commencing at the south point of lot 6, and continuing as 30 feet wide clear down and around the appellant's property and up to the south line of lot 29. From that line north it gradually widened until it was marked as 45 feet wide at its junction with Tenth street. Where it was laid out on the plat

as 30 feet wide it corresponded in width with the old Duncombe private drive, as testified to by the appellant's husband.

When the appellant bought her property in 1921, Tenth street had been opened south of Fourth avenue as far south as the Gorman property on lot 27 of the plat. In 1924, the street department of Fort Dodge, extended Tenth street south, along what is marked "Fair Oaks Drive", to a short distance below the east end of the appellant's property. The street was excavated to a depth of three or four feet and put down to grade. From that time on the appellant could drive from any part of her property along the drive and north on the new road to Fourth avenue. But little work was done by the city along this route after 1925, other than occasionally to drag the road, or to place a little gravel on it.

About 1929 the Independent School District of Fort Dodge became interested in acquiring the Duncombe property as a site for a Junior High School and playgrounds. In 1930, the school building, shown on the plat north of the appellant's property, was erected. In that year representatives of the school district talked with the appellant and her husband about acquiring a part off of the west end of their property, and about closing the street or drive leading south from Ninth street to their property. The district had either acquired or was about to acquire lots 35 to 45, inclusive, and lots 1 to 15, inclusive, and it wished to vacate "Fair Oaks Drive" between these two tracts. It was agreed by the district, and apparently by the city, that if this could be done, that they would have the extension of Tenth street, south from Fourth avenue, improved so as to give the appellant a better outlet from her property over that route. Believing it to be her civic duty to accommodate the district in its purpose, although it was a detriment to her, she acceded to the desires of the district. She and her husband, in December 1931, conveyed to the school district, the west 34 feet of her property, measuring east along the north line from the northwest corner thereof. The district thus acquired a triangular tract whose east boundary line was 39.9 feet long.

To further accommodate the district, the city of Fort Dodge, on March 21, 1933, adopted ordinance No. 797, vacating "Fair Oaks Drive", and part of an alley opening in to it and between lot 15 and part of lot 16 on the west, and part of lot 17 on the east. This vacated the drive and closed it from a point on the

southwest boundary of the appellant's property, 179.2 feet from what had been the original northwest corner of her property, to the line where the drive opened into Fourth avenue, just south of Ninth street. The south boundary line of this vacated tract is marked on the plat herein, by the line "f g", extending parallel to and 15 feet south of the north line of lot 16, and slightly southeast across lot 17 and across the drive to a point on the south boundary line of appellant's property. This ordinance became effective by publication, September 11, 1933. By it the mayor and the city clerk were directed to execute a quitclaim deed of the vacated property to the district. Thereafter the appellant had no ingress or egress at the old entrance on the west end of her property, marked "B C" on the plat, nor at any point along her southwest line for a distance of 179.2 feet from her original northwest corner.

On November 5, 1929, the city, by ordinance No. 761, authorized the establishment of a street across lots 16, 17 and 19, and then easterly. Later, but just when the record does not show, the city, by ordinance No. 771, repealed ordinance No. 761, for the recited reason that the described land had never been taken for street purposes, and the necessity for the street no longer existed. In connection with these matters, a blueprint of the city engineering department, Exhibit 3, bearing date of February 6, 1933, showing the portions of lots 16, 17 and 19, which were to be accepted for street purposes, was offered in evidence. These portions, as shown by the exhibit, include the south 35 feet of lot 16, the south approximately 62.1 feet of lot 17, and all of lot 19, south of the line "f g" on the plat in this opinion. This portion of lot 19 is an irregular piece with the south line of the drive for its north boundary, its west line 62.1 feet, its south line 200 feet, and its east line 25 feet, in length.

On October 12, 1937, the city council, by ordinance No. 847, vacated the portions of lots 16, 17 and 19 above described, and directed the mayor, to quitclaim to the school district "the interests of the city in the streets so vacated". We mention the matters in this and the two preceding paragraphs, because the appellees contend that the apellant has a way from her property to public highways to the west and southwest. The school district owns all the property, immediately contiguous to her property, in those directions.

As had been agreed by the appellant and the district, improvements were made on the extension of Tenth street south of Fourth avenue to the appellant's property, in 1931. It was widened, cut down and graded. The property owners on the west side of it, south of Fourth avenue, including the appellant, conveyed a strip of ground off the east side of their properties, 18 feet wide, to the city. The drive abutting on the appellant's property, south and west of its new southeast corner, was not changed, either by widening or grading. The appellant filled holes with cinders and surfaced this portion of the drive or street.

In 1936, the Highway Commission of the state began the extension of highways 20 and 169 across Fort Dodge. The line "X Y", extending from northeast southwesterly across the plat herein, marks the center line of the paved portion of this highway. The paved portion is 34 feet wide. The minimum width of the roadway is 56 feet, that is 28 feet on each side of the center line. That is its width where there is no cut. But the width of the roadway varies with the depth of the cut. The deeper the cut, the wider the roadway. This follows because it is necessary that the banks of the cuts be properly sloped.

According to the testimony of appellees' engineer, who gave his distances by scaling a blueprint with a rule in the courtroom, and not from actual measurements on the ground, the nearest that the top of the sloping bank came to the appellant's property was at the southeast corner thereof. The blueprints used by the witness, were Exhibit B, apparently made by the appellees for the purpose of the trial, and Exhibit 2-a, a blueprint used by the appellees in their construction work. After the appellant conveyed the east 18 feet of her property to the city in 1931, the east line of her property was a straight line, about 25 feet long, perpendicular to the north boundary line. The point referred to by the engineer was the south end of this line. The width of the old drive or street at this point, as shown on Exhibit B, is approximately 50 feet, and on Exhibit 2-a it is less by ten feet. The depth of the new cut at this point is between three and three and one-half feet according to this witness. The center line of the paving at this point is approximately 63 feet distant according to Exhibit B. He also testified that the deepest cut in the new road was opposite the driveway into the appellant's garage. There the depth is nine

and one-half feet at the center line of the pavement. Here he testified the top of the sloping bank was approximately fifteen feet from the appellant's line. The center line of the paving at this point is approximately 63 feet distant from the appellant's line. It is difficult to reconcile the witness' distances at these two points. We do not understand just why, with the distances from the center pavement line approximately the same, at these two points, the top of the bank should be ten feet away where the cut is three or three and a half feet deep, and five feet farther away where the cut is nine and one-half feet deep. He admitted on cross-examination, that if the stone wall was on the line, the closest point which he mentions, would be eight feet from the top of the bank, and the distance at the garage driveway would be 12 or 13 feet distant. On the commission's construction blueprint, Exhibit 2-a, the distances from the center line of the pavement at the two mentioned points on the appellant's line are shown to be approximately fifty feet at each place. On this last-mentioned blueprint the stone wall on appellant's south boundary, immediately west of the driveway into the garage, is approximately forty feet distant. This same witness referred to appellee's two Exhibits 3 and 4, which were blueprints made by someone in the Fort Dodge city engineer's office, and bearing dates, respectively, of February 6, 1933, and February 3, 1933, and said that from data obtained therefrom, by actual survey, he had "located two of the Dawson lot corners". One of these was an iron stake at the northeast corner, and the other a wooden stake at the southeast corner, "eighteen feet south". The wooden stake he admits does not show on Exhibits 3 and 4. The appellant had conveyed the east 18 feet of her property in 1931, to the city for the purpose of widening the street. The street was widened, and the ground at the original corners, where the stakes would have been placed, was excavated to a depth of three or four feet. Also the blueprints, Exhibits 3 and 4, made in February 1933, show the dimension of the north line of appellant's property to then have been 363.4 feet, although this original dimension was 365 feet, and 18 feet was cut therefrom in 1931. Since the south boundary line angles to the right 56 degrees and 24 minutes, the new southeast corner would not be 18 feet south of the new northeast corner, but more nearly 25 feet south. When these plats were made in early February, there was probably a minimum

of digging. This witness also testified that he "thought" and "assumed" that the stone wall was not on the true boundary line, but south thereof and testified as to distances on that assumption. He made no claim that he located any other corners or stakes on the appellant's property lines. The appellees' Exhibit B, no doubt prepared by them, shows that the stone wall, for over a hundred feet west of the garage driveway, coincides with their conception of the south boundary line, and their Exhibit 2-a shows the wall to be north of a dotted line, apparently approximating the south line of the property. The husband of the appellant testified that the wall was built just two years after the property was purchased. He said it was built on the true boundary line. At that time it is very probable that all the corners and stakes could be readily found. His grantors still owned the servient estate. Perhaps some lived in the locality, and were interested in the correct location of any landmarks on the boundary. We see no reason to question the correctness of his testimony on this issue.

I. As heretofore noted, the stipulation in the appellant's contract of purchase, that her grantors would grant the easement, in question, in their deed consummating the transaction, was not complied with, although both instruments were drawn on the same day. Appellant claims this was an inadvertence, and that there was no intention on the part of either party to waive the provision of the contract. The trial court sustained this contention of appellant, and decreed that contract, in all of its provisions, was not merged in the deed, by the appellant's acceptance of it. While the appellees have not appealed from any part of the decree, they question, in argument, this holding of the court.

Ordinarily the acceptance of the deed completes the execution of the contract, and is conclusive evidence of its complete fulfilment. But this principle does not apply to a collateral and accessorial agreement of this kind. This question is ruled by our holdings in Carey v. Walker, 172 Iowa 236, 154 N. W. 425; Sutcliffe v. Pence, 156 Iowa 643, 137 N. W. 1026; Thordson v. Kruse, 173 Iowa 268, 155 N. W. 334; Puttman v. Haltey, 24 Iowa 425. See, also, Morris v. Whitcher, 20 N. Y. 41; Reid v. Sycks, 27 Ohio State 285, and brief in 84 A. L. R. 1008.

II. The decisive factor in this case is the location of the easement provided for in the contract. An easement has

been defined as a privilege, or right, without profit, which the owner of one piece of real estate may have in the real estate of another, or, conversely, it is a service which one tract of land owes to another tract. City of Dubuque v. Maloney, 9 Iowa 450, 455, 74 Am. Dec. 358; Karmuller v. Krotz, 18 Iowa 352; Cook v. Chicago, B. & Q. R. Co., 40 Iowa 451; Churchill v. Burlington Water Co., 94 Iowa 89, 62 N. W. 646; Stokes v. Maxson, 113 Iowa 122, 124, 84 N. W. 949, 86 Am. St. Rep. 367; 19 Corpus Juris, Easements, sec. 1.

The land which is entitled to the easement or service is called the dominant tenement, and the land which is burdened with the servitude, is called the servient tenement. Neither easements or servitudes are personal, but they are accessory to, and run with, the land. The first, with the dominant tenement, and the second with the servient tenement. Goddard, The Law of Easements, 8th Ed., 2; Gale, Law of Easements, 1932, 11th Ed., 1; Washburn, Easements and Servitudes; Jones, Easements, 3; Reynolds v. Union Sav. Bank, 155 Iowa 519, 136 N. W. 529, 49 L. R. A. (N. S.) 194.

The easement, provided for in the appellant's contract of purchase, was "the right of ingress and egress to the above described property on the driveway *now existing* from Ninth street in the city of Fort Dodge, Iowa, to the property above described, the exact description of said property covered by said easement to be obtained and become a part of the deed above described." (Italics ours.) This clause is not ambiguous. It does not have two or more doubtful meanings. The intention of the parties is plain and certain. They intended an easement, on the driveway as it then existed. The only matter lacking is "the exact description". The matter granted is identified generally, but its specific outlines are lacking. The language of the clause concedes that there was a driveway appurtenant to the property whose title was conveyed. It further concedes that it was a driveway capable of exact description. It was one whose termini and boundaries were definite and certain, and were capable of exact determination. This was a matter of identification. Extrinsic evidence was admissible for this purpose. This place had always been used as a home, with the usual out-buildings and barns, incidental to such use. Transportation, while the Duncombes lived there, had been by horse-drawn vehicles. Both front and rear entrances were used. There was no

driveway across the property conveyed, from the front to the rear. Access was by means of the drive around the premises from the front to the rear, or conversely. Before anyone could leave the property the horses and vehicles had to be brought either to the rear entrance or to the front entrance by means of the outside drive. This drive from the front to the rear of the property was essential to its full enjoyment. The way for hauling fuel was necessary to the use of the property as a home. The Dawsons bought the property for a home. It is true they used motor vehicles for transportation, but the outside drive and the three entrances and driveways were just as essential for the full enjoyment of the property as a home. No one disputes the existence of the outside drive, or any of the driveways, or entrances, or their use. The Dawsons testify that all of them existed, and were well traveled, and in use when they bought the property, and that the outside drive from the northwest corner around the property to its northeast corner, was then in use to its full width of thirty feet. No witness in any way contradicts this testimony. It must be taken as true. The Duncombe family was a prominent one in Fort Dodge. The home and its surroundings were, no doubt, familiar to most of the people of Fort Dodge. The trial below was only eighteen years after the Dawsons bought the property. Certainly if their testimony was not true, many witnesses were available to contradict them.

None were called for this purpose. The appellees called the street commissioner of twenty years previous, and one of his helpers, as witnesses to show the work done on this roadway. They did the grading on the Tenth street extension in 1924. It is true the plat and dedication were in 1921, but there had been no changes on the ground until in 1924. These men hauled gravel upon and did some dragging on the old drive around the Dawson property. If any person would be likely to know the length and breadth of this drive, these men who worked upon it would have that knowledge. It is very significant that although these matters were vital to the appellees' case, they were not questioned about them. The entrance to the Nettie Hull Duncombe home was about one third of the distance from the northeast corner of her property—about 66 feet from it. The only access to this property was over the private drive to this entrance. It was over one hundred feet east of

the west entrance of appellants. It appears on the plat just below the word "Oaks". So the drive must have extended not only "to" but beyond this west entrance, and "along" the appellant's property, at least this far. There were, no doubt, many functions, and many callers at the Duncombe home, and many carriages used the drive. Something more than an eight or ten foot roadway was needed. A broken line is shown in the drive or street along in front of the driveway into the garage. This indicates approximately the distance of the top of the bank from the property. The testimony of the appellant is that access to her property was so narrowed and impaired as to destroy its use and value as a home. For that reason she was compelled to sell it to the school district, but she reserved her claim for damages against the appellees. We have no hesitancy in finding that when the contract was made the drive in which the easement was granted was used for its full width of thirty feet clear around the curved boundary of the property. It is the undisputed testimony of the appellant and her husband, and it is strongly corroborated by every surrounding circumstance.

The following principle is stated in 19 C. J., Easements, sec. 211:

"Sec. 211 b. Ways Existing at Time of Grant. When a right of way is granted over certain land without fixing its location, but there is a way already located at the time of the grant, this will be held to be the location of the way granted, and the grantee cannot be compelled to accept a substitute therefor. Under the circumstances it will be presumed that the parties had in mind the way already located. A grant of the right to pass 'over the accustomed way' refers to the custom existing at the time of the conveyance."

The appellees have cited cases and have argued that if there was an easement existing, all that the appellant is entitled to was a way which afforded her reasonable access. This may be the law where the location of the way is indefinite and has never been fixed, but it is not the law where the location is definitely determined, as we find it is in this case. In such case the grantee is entitled to all his contract gives him. The grantors in this contract and deed are not complaining, nor is the school district, which is the owner in large part of the or-

iginal servient estate. They are not parties to the case and are not disputing appellant's claims. The appellees are strangers to the contract, and yet they are seeking to establish what was the agreement of its parties, and also what is a reasonable substitute for what was granted. The robber who leaves in his victim's purse sufficient money for taxi fare home does not exactly absolve himself, even though he may think it is all the victim reasonably needs.

It is our judgment that the defendant commissioners have taken the larger part of the drive, street, or way over which the appellant had an easement, and that in doing so they have destroyed a property right which she had therein, and have very seriously interfered with and impaired the access which she had to and from her land, causing her damage which she is entitled to have established in the manner required by law.

Other matters have been argued by appellees as to why the decree should be affirmed. As to some of these the court below held against them. They have not appealed and we will not dwell upon them.

The appellees have urged and the trial court held that the appellant waived and parted with her easement rights when she consented to the closing of the drive or street from Ninth street to the west end of her property. She had a right to part with all or any portion of her easement. Releasing her rights in this particular portion of the drive cannot be held to have been a release of her rights in the remainder of the drive. Tenth street had been opened and she did not need the outlet to Ninth street, but she did need the remainder of the drive to give her access to Tenth street. Without this she would have been entirely cut off from entrance to or exit from her property to the public highways. It is beyond any reasonable question that she had no intention of abandoning any of her easement rights in the drive below and beyond the line "f g" of the plat herein.

Abandonment is an affirmative defense and must be established in this case by clear and unequivocal evidence. The appellees have failed to do this.

Under the entire record we are satisfied that the decree appealed from should be reversed as to all parts thereof adverse to the appellant. It is so ordered and the trial court is directed to enter a decree in conformity herewith, and to issue

a writ of mandamus as prayed for by the appellant.—Reversed and remanded.

MITCHELL, C. J., and HAMILTON, SAGER, HALE, OLIVER, and MILLER, JJ., concur.