ROBERT E. YOUNG et al., Appellees, v. H. L. DUCIL et al., Appellants.

EASEMENTS: Naked Use. *Naked use* of land as a road, with consent of the owner, howsoever long continued, will not ripen into an easement.

DEDICATION: Use of Land for Road—Presumption. No presumption or inference of dedication arises from the naked *use* of land for a roadway, howsoever long continued. One may not be held to have dedicated his land to public or private use, short of evidence which establishes a positive and unmistakable intention to permanently abandon his property to public or private use.

*Appeal from Pottawattamie District Court.*—E. B. WOODRUFF, Judge.

FEBRUARY 16, 1920.

Action to enjoin the obstruction of what is claimed to be a public and private road. Opinion states the facts. Judgment for the plaintiffs in the court below. Defendants appeal.—*Reversed.*

*Saunders & Stuart,* for appellants.

*Kimball & Peterson,* for appellees.

Gaynor, J.—This action is brought to restrain the defendants from interfering in any manner with plaintiffs in the exercise of a claimed right to cross defendants' land at a certain point. It is asserted that there is a roadway at the point where plaintiffs claim the right to cross; that this roadway has existed and has been used by plaintiffs and the general public for a great many years; and that plaintiffs have acquired an easement in defendants' land, and a right to cross it within the limits of this road. Plaintiffs say that they and their grantors have continuously, openly, notoriously, and adversely used this roadway, as a means of access to their premises, for more than 20 years, and that the road has been so used by them and the public generally; that this defendant, Ducil, but recently acquired the ownership of the property on which the road lies; that his predecessors and immediate grantors have acquiesced in the claims of the plaintiffs, and have acquiesced in the easement in favor of plaintiffs, for more than 20 years; that the defendants are now estopped from denying plaintiffs' right to cross the premises over this road, and are estopped to deny plaintiffs' claim to an easement therein; that the defendant Sollazo is the tenant of the defendant Ducil, in possession; that this is the only way of ingress or egress to plaintiffs' property; that, unless restrained, the defendants will destroy the rights of the plaintiffs in the easement herein asserted.

1. EASEMENTS: naked use.

The defendants deny plaintiffs' claim; deny that plaintiffs have acquired any easement in any road over the land, and especially deny that plaintiffs have any easement at the place where they now claim a right to pass over the land; say that plaintiffs are not denied ingress and egress to their land; that, on the east of plaintiffs' land, there is a creek; that, on the east of the creek, is Broadway, a well-traveled and paved street; that, by the construction of a bridge over this creek, complete access to plaintiffs' land can be had from Broadway. Defendants filed a cross-petition, saying that the claim of plaintiffs is a cloud on their title, and asking that their title be quieted against plaintiffs' claim.

Upon the issues thus tendered, the cause was tried to the court, and a decree entered for the plaintiffs, as prayed. From this, defendants appeal.

In order to properly understand these conflicting claims and the evidence relied upon to support them, it is necessary that we have a knowledge of the location and situation of the respective properties and the public streets of the city.

Broadway is one of the principal streets, runs north and south, and is on the east side of the property in question. Indian Creek is on the west side of Broadway, and is between the lands owned by these parties and Broadway. It is a deep creek, and Broadway cannot be reached from plaintiffs' property without bridging it. On the south of defendants' property is a street known as Fleming Street. This runs east and west, crosses Indian Creek, and abuts on Broadway. Defendants' property, over which this road is claimed, abuts on and is immediately north of Fleming Street. Plaintiffs' property adjoins defendants' property on the north, and is bounded also on the east by Indian Creek and Broadway. All the land now owned by plaintiffs and defendants was formerly owned by one N. W.

Williams. N. W. Williams sold the land now claimed by
the plaintiffs, to one Lou Hammer. Hammer sold it to the
plaintiffs in 1899. N. W. Williams, in 1896, sold to Mark
Williams the property now owned by the defendants. In
1906, Mark Williams sold to one Norgaard, and Norgaard,
in 1917, sold to the Vierland Company, and, in the
same year, the defendants purchased it. from that
company. During the time Mark Williams and Norgaard
owned the property, there was a brick kiln on the proper-
ty, running north and south, paralleling Indian Creek. A
little farther north, and to the west of the kilns, was a grist-
mill. These kilns and this mill were operated during that
time by either Williams or Norgaard. The road in question
was used through all this time as a way of access to the
mills and brickyards, and ran in a northerly direction
from Fleming Street to the mills and brickyards. It was
used by the owners of these mills and brickyard in connec-
tion with their business. It ran along the west side of the
brick kilns, and the east side of the gristmill. It was used
by persons who came upon defendants' land to transact
business at the brickyard and the mill, to haul grain to the
mill for grinding, and to haul feed after it was ground, and
to haul wood used in burning the brick, and to haul away
the brick when burned. It seems to have left Fleming
Street at a definite point, but spread out over the yards,
and was used as the convenience or exigencies of the busi-
ness at the mill and yards required. In other words, it
was a sort of doorway, opened to the public by the then
owners, as a way of access to the property and the busi-
ness carried on thereon. This road, if we call it such, ex-
tended to the north line of the land so used. There also
seems to have been a dumping place north, and along the
side of the river, to which refuse was carried over this road
and dumped—by whom, it does not appear. Plaintiffs'
house was about 200 feet west of the north terminus of this

claimed road. Plaintiffs, in coming into the city, passed 200 feet east on their own land, reached the point of travel on what is claimed to be the road now in dispute, and turned south, and passed along by the mills and brick-yards to Fleming Street, thence east on Fleming Street over the bridge onto Broadway.

It does not appear that the public used any portion of this road beyond the north limits of the property so occupied by the defendants, and then only for the purpose of transacting business with the defendants' grantors at this mill and at these yards. There is some testimony that one Albury, who worked for Mark Fleming in the mill or in the yards, passed over this road in reaching his place of work. The use to which this road, if it be a road, was put, is well exemplified in the testimony of one Weaver, who lived in the plaintiffs' house in 1897, just before the plaintiffs bought it. He said:

"During the summer I lived there, people were coming to the brickyard, hauling wood and piling it there to burn brick, and coming in there and hauling away brick from the brickyard, and bringing grain and material to the mill, and hauling away feed, driving stock to and from the stockyards, and buying and selling cattle at the stockyards. The road was about halfway between the brick kiln and the mill, one on one side of the road and one on the other, and was about 30 feet east of the mill, measured from about the center of the brick kiln, and the track was used in going to the mill and kilns, and to deliver goods to Young's house."

Another witness testified that he had seen this place (meaning the road and territory surrounding it) frequently since 1893; that there was no bridge between Fleming Avenue and Elliott Street. (Elliott Street is north of Fleming Avenue.)

"People coming to this place traveled over the same road to the brickyard. The road was practically where it

is now. I saw a good many teams go out and in there. I saw people go to the kiln and mill, and saw people dumping garbage on the east side of the road. The road extended clear to the line of the place. The object of dumping garbage was to fill up the ground. The ground was naturally low, and that was what the garbage was put in there for, to fill the low land as high as the bench. On the lower side, it was filled up with garbage, and the ground had been raised by filling in with brickbats and stuff of that kind. There was a stockyards in there at one time, operated by Hammer & Able. They were buying and selling stock, and Able used to buy stock and put it in these yards and keep them there until he could take them out for sale. Stock was driven back and forward over these lots."

It will be noted that the claimed road was not originally designed for public travel. It was not originally used for public travel. Its purpose was to afford access to the business conducted by the owners on their own property. To that purpose, it was devoted by the owners of the property, and for that purpose it was used by the public. Plaintiff, whose property lies north of the north terminus of the road in question, had a roadway from his home east about 200 feet towards Indian Creek, to a point marking the north terminus of the road over defendants' property. There is no doubt that he traveled east on his road, and then south over this tract, known as the mill property, for more than 10 years. He claims as easement by prescription,—a right to compel the owners of the land, upon which this mill road was, to keep it open for his private use. What are his rights under the record made?

Section 3004 of the Code of 1897 provides:

"In all actions *hereafter* brought, in which title to any easement in real estate shall be claimed by virtue of adverse possession thereof for the period of ten years, the use of the same shall not be admitted as *evidence* that the

party claimed the easement as his right, but the fact of adverse possession shall be established by evidence distinct from and independent of its use, and that the party against whom the claim is made had express notice thereof; and these provisions shall apply to public as well as private claims."

Mere proof of use, therefore, is not sufficient. The use may be permissive only. To invest the plaintiff with a right to a continued use, he must show something more than use for the statutory period, and two things more are essential: (1) That he claimed an easement as his right, and this must be established by evidence distinct from and independent of its use; and (2) that the party against whom the claim is made had express notice thereof,—that is, not of the use, but of the claim of right to use against the objections or protest of the owner. A right that starts permissively, and is not claimed as a right independent of permission, does not start the running of the statute. Plaintiff has recognized this fact in the preparation of his case, and has sought to show, by evidence independent of the use, a claim of right to the use, and knowledge of the owners of the land of this claimed right.

It will be noted that the statute above quoted was adopted in 1873. It was not in any of the statutes preceding that, and added a new rule—a more stringent rule than was required prior to that time. So, therefore, decisions made prior to the adoption of this statute do not control in controversies of this kind, and are not entitled to be considered. The legislature made the paramount law. It is this that governs in all actions arising since the adoption of the statute. To meet the requirements of the statute, the record must show something, independent of user, that indicates that the plaintiff was claiming a right to the use of the street adverse to the owner of the land; that he was claiming a right to use it, and not that he was simply tak-

ing advantage of the fact that no objections were urged to his use. He testified:

"I lived continuously in the place from the time I bought it until two years ago. I used this road as a means of ingress and egress to my lots, and traveled it nearly every day, more or less. Delivery wagons came up that road to my place, and I went down the road to get my mail. I went to Mark Williams, when he owned the place, and got 15 or 20 loads of brickbats from him and put them at the foot of the hill on my place, and then I put dirt over that from the dirt on the bank. The brickbats were on the ground where Williams was going to put a kiln that spring, and he was glad to have them hauled off, as it saved him hauling. His men helped shovel the brickbats into my wagon. The brickbats I put on the road that runs down on my place to where I turned to go on the Williams' property. He told me I could have all I wanted, for he would have to haul them away."

So it is apparent that the improvement, by the use of the brickbats, was not placed upon any part of the road now in controversy. There is no evidence that he ever verbally asserted to Mark Williams any claim of right to use this road, and never, until just before the suit was brought, did he make any such assertion to Norgaard, successor to Mark Williams. He says:

"I don't think Mr. Norgaard and I raised the question, until this Italian fenced this lot up. That was about three years before the trial was had."

It is next contended that, some time after Norgaard got the property, plaintiffs and Norgaard proposed to plat the entire property, Norgaard's and plaintiffs'; that they prepared plats; that the plats were submitted to the city council; that the plats, as prepared, provided for a street along the line now claimed by plaintiffs; that the

2. DEDICATION: use of land for road: presumption.

city refused to approve the plats; that the scheme was abandoned. It appears that, thereafter, Norgaard platted some lots along the south side of his property, abutting on Fleming Street, and that these lots were 50 feet wide, and numbered 1, 2, 3, etc., towards the west; that lot No. 1 on the plat covered the very point where it is claimed this street entered defendants' property from Fleming Avenue; that Lot 2 was sold to a man by the name of Fredrickson; that Fredrickson improved his lot, and, we think the record shows, built upon it. It does not show that Lot 1, to the east of Fredrickson's, covering the place where the road left Fleming Avenue, was ever sold or improved. There is also some claim that a culvert was put in at a point where this road leaves Fleming Avenue. There is no significance in this, however, for the reason that, at that time, the road was used in connection with the mill and yards, and it affords no basis for saying either that the owners of the land knew of plaintiffs' claim, or that they acquiesced in it. There is absolutely no evidence in this record of any intent on the part of the owners to dedicate this road to public use. As bearing upon this question, see *Gates v. Colfax N. R. Co.*, 177 Iowa 690; *Jones v. Peterson*, 178 Iowa 1389; *McBride v. Bair*, 134 Iowa 661; *O'Malley v. Dillenbeck Lbr. Co.*, 141 Iowa 186.

As said in *Jones v. Peterson*, 178 Iowa 1389, 1394:

"Nor is there any presumption or inference of a dedication from mere use alone, but there must be some act or word or course of conduct on part of the alleged dedicator, fairly indicating his actual intent to give or grant the easement to public use. As said in a very recent case: 'The owner's acts and declarations should be deliberate, unequivocal, and decisive, manifesting a positive and unmistakable intention to permanently abandon his property to the specific public use.' * * * An owner of property should not be held to intend an abandonment or surrender of it to

public use on doubtful or unsubstantial grounds, or because of conduct which is entirely consistent with the absence of such intention. There is nothing whatever in the evidence showing that plaintiff or any of his grantors ever contemplated or manifested any purpose to dedicate this road to the public."

The same doctrine was repeated in *O'Malley v. Lumber Co.*, supra. In *McBride v. Bair*, supra, it is said:

"Undoubtedly, defendant and those under whom he claims knew of the use, but user and knowledge thereof is not enough. There must have been a claim of right, independent of user, of which defendant or those under whom he holds had express notice."

Applying the rule of these cases to the situation here, we have to say that the conduct of the defendants touching this right was entirely consistent with the absence of any intent to dedicate it to public use. The road was there, and used for their own purposes. It was used in connection with the business carried on by them upon the lots to which the road made access. There is certainly no evidence which manifests "a positive and unmistakable intention to permanently abandon this property to public use," or to the private use of these plaintiffs. The best that the record shows is that the owners of this property did not object to plaintiffs' using the road, so long as there was no bridge across Indian Creek at the point where plaintiffs' property was situated. The best that can be said for plaintiffs' use is that it was permissive, and this is not sufficient, under the statute, to sustain a claim of right to a permanent easement in the property—a right to be exercised against the will of the owners of the estate.

Upon the whole record, we think the court erred in finding for the plaintiff. Judgment and decree should have been entered for defendants. Its judgment is, therefore,— *Reversed.*

WEAVER, C. J., LADD and STEVENS, JJ., concur.