CHARLES A. DYER et al., Plaintiff-Appellants, v. E. F. KNOWLES et al., Trustees; W. E. OXLEY, Receiver, Defendant-Appellants and Appellees.

No. 44833.

FEBRUARY 6, 1940.

Arthur J. Braginton, for plaintiff-appellants.

Gray & Gray, Morling, Carmichael & Morling, for defendant-appellants and appellees.

BLISS, J.—About 1890, heir M. Fagan acquired title to all of the west half of said section six, except the northeast quarter of the northwest quarter, containing about 272 acres. The building spot later selected by him was near the west quarter section corner.

On January 19, 1923, Fagan placed an $18,000 first mortgage on the southwest quarter of the section, and the southeast quarter of the northwest quarter, which note and mortgage were later assigned to the Metropolitan Life Insurance Co. He placed a first mortgage to the John Hancock Mutual Life Insurance Co. on the west half of the northwest quarter of the section. He gave to J. M. Snyder a second mortgage on all of his land. Later he gave mortgages on various portions of his land, junior to those already referred to, to some of the various individuals and banks, named as defendants. On March 12, 1930, he conveyed his entire farm to the defendant, F. E. Knowles, as trustee, for the purpose of applying the proceeds of the rents, and the sale of any of the land to satisfy the second and junior mortgages. All of the west forties of the farm were fractional—the northwest quarter of the northwest quarter being long, in acreage, and the other three forties being short.

In the early part of 1932, Knowles sold the northwest quarter of the northwest quarter to Parker. In order to make the sale to Parker it was necessary to get a release of Snyder's second mortgage on this forty. Snyder agreed to release on the Parker forty providing the proceeds of the Parker purchase were used to pay off the John Hancock Mutual Ins. Co. first

mortgage on the west half of the northwest quarter. This was done. Snyder's mortgage was then first on the southwest quarter of the northwest quarter, and second on the land covered by the Metropolitan mortgage. It was very questionable whether the junior mortgagees had any equity over and above the Metropolitan and Snyder mortgages. Knowles then began to negotiate with Snyder to get his mortgage out of the way, by selling the fractional southwest quarter of the northwest quarter to him. In the summer of 1932, Knowles and Snyder went out to inspect the land. Neither of them knew where the south boundary line of the southwest quarter of the northwest quarter was. Knowles offered to convey this fractional forty to Snyder in consideration of a release of the Snyder mortgage on the southwest quarter of the section and the southeast quarter of the northwest quarter. There was a barn and corncrib very close to what they figured must be the south boundary line of the fractional forty which Knowles proposed to convey. From the northeast corner of the barn a rather crooked fence extended east to the west bank of a drainage ditch extending north and south, a short distance west of the east line of the forty. West of the barn the fence jogged 10 or 15 feet north and extended west into a grove to the west of the corncrib. Through the grove the wire of the fence was stapled on to the trees. Neither side claims that this was a division or partition fence. It was simply a fence to separate the fields and barn lots. Knowles and Snyder, in trying to locate the south boundary line, walked east of the barn along the fence toward the supposed center of the section for some distance. They then sighted west along the fence. In doing this Knowles thought the line must be just north of the barn and crib. Snyder testified that if you sighted over one post the line would be north of the barn, and if you sighted over another post, the line would run into the barn. When they left the place, they stopped in the road west of the grove and sighted east, but could come to no conclusion as to where the boundary line was. Knowles testified that he thought the line was just north of the buildings. Snyder testified that he did not know where the line was, or whether part or all of the buildings were north of the line, but that he was claiming all of the governmental forty. Neither Snyder nor Knowles saw each other thereafter for several months. On De-

cember 27, 1932, Knowles, as trustee, executed and delivered to Snyder a quitclaim deed, conveying to the latter the fractional southwest quarter of the northwest quarter of said section six. Snyder released his mortgage on all of the land.

The Metropolitan Life Insurance Co. took decree in the foreclosure of its mortgage in March, 1934. The defendant, Oxley, was appointed receiver under the foreclosure and the defendant, Charles I. Hoehn, was continued as lessee under the receiver. He had farmed all of the Fagan land since 1929. Snyder had leased his fractional forty to Hoehn, who farmed part of it and sublet part of it. The residence and other farm buildings were south and west of the barn and corncrib.

In July, 1935, Snyder sold his fractional forty to the plaintiff, Chas. A. Dyer, and delivered deed to him the following March. This deed conveyed the fractional southwest quarter of the northwest quarter of said section six. Dyer at the time of the purchase made some inquiry of Hoehn as to the location of the south boundary line. Hoehn said he thought it was just north of the barn and crib. Dyer also made some demand upon the representatives of the Metropolitan at Ft. Dodge, in 1935, as to the location of the line. He also talked with Oxley, and claimed the barn and crib were on his land. He said Oxley suggested that he lease these buildings to Hoehn. Oxley denies this. Dyer also talked with Gray, attorney for the insurance company, and for Knowles. Some time in 1937 an official survey was made, and the governmental south boundary line was located just south of the barn and corncrib. All parties concede that this is the true line.

In September, 1937, the plaintiffs commenced this action. The Metropolitan Life Insurance Company filed answer alleging a number of defenses, among which was the claim that Knowles and Snyder had agreed upon a boundary line north of the buildings, and that through mistake the scrivener had neglected to so describe the land in the deed. It also alleged that it had placed its mortgage and bid in the property, relying upon the representations of Fagan that the barn and corncrib were on the southwest quarter of the section. There was no evidence to prove this last allegation.

It also alleged that the barn and corncrib were necessary to the use and enjoyment of the remaining land retained by

Knowles, and that Snyder and Dyer had visible notice of that fact, and that in making the sale to Snyder, there was an implied reservation of the use and occupancy of these buildings and the ground appurtenant thereto, by the grantor. All other defendants adopted the answer of the insurance company.

The trial court found that there was insufficient evidence to support a finding that Snyder and Knowles had agreed that a line just north of the buildings should be taken and established as the south boundary line of the land being sold to Snyder. We fully agree with the trial court's finding and judgment as to this fact: When Snyder and Knowles went out to the farm their purpose was to see if they could ascertain by inspection and sighting through where the true or governmental south boundary line was—that is the true boundary line between the northwest and southwest quarters of the section. They did not go out to agree upon a boundary line, or to select any landmarks on the ground as indicating the line which they would then and thereafter accept as the line. There is no support for any such contention. Knowles' testimony clearly establishes that this was neither their intention nor act. He testified that they never determined where the line was, nor discussed the buildings as the division line. Knowles said he was conveying whatever the deed called for. Snyder testified that they never agreed upon a boundary line. The deed, itself, confirms this testimony, as it expressly describes the land conveyed by its governmental description. There is no evidence of any mistake on the part of the scrivener of the deed, or of the parties to its execution and delivery.

With respect to the alleged defense that there was an implied reservation of the use and occupancy of the barn and crib, the defendants have placed themselves in inconsistent positions, that cannot be reconciled. One defense is that Knowles and Snyder definitely agreed upon a boundary line north of the buildings, thus excluding them from the transaction, and leaving not only the right to their use and occupancy in Knowles, but also their ownership and title.

The other defense is that the governmental subdivision and whatever was within its boundaries, including these buildings, was sold to Snyder, but there was an implied reservation

that Knowles and those holding under him, were to have the possession, use and occupancy of the buildings.

The theory of the defense being that since the buildings, while the entire farm was under single ownership, were used in connection with the land retained by Knowles, as an essential part of its use of a farm, and that this use was plainly evident to Snyder, that he took the land conveyed to him burdened with an easement or right appurtenant to the unsold and dominant estate to the use and occupancy of these buildings. We find no basis for this theory as a matter of fact in this case, and little basis for it as a matter of law. In the first place the buildings had always been used as an essential part of the land conveyed, the same as they had been used in connection with the unsold land. This connection and use was just as essential, to the part sold, in proportion to the acreage, as it was to the part retained.

■ It may be conceded that it is quite well settled as a proposition of law that where real estate has been used under single ownership and as a unity, one part of it may be burdened with a use which is largely or entirely for the benefit of another part of it. Thus one part of it may be necessary to afford drainage to another part, or a path or roadway outlet to a public highway for some back lying portion of the land. Or an apartment or business building may be so constructed that there is a common access to its various parts. Under any such circumstances if the ownership should be divided by devise, descent or sale, one part may be burdened or benefited by the implied reservation or granting of one of these easement rights, if it is apparent and necessary. See 19 C. J. 921; 9 R. C. L. 765; Lampman v. Milks, 21 N. Y. 505; Larsen v. Peterson, 53 N. J. Eq. 88, 30 A. 1094; Morrison v. Marquardt, 24 Iowa 35, 92 Am. Dec. 444; Kane v. Templin, 158 Iowa 24, 138 N. W. 901; La Plant v. Schuman, 197 Iowa 466, 196 N. W. 280; Marshall Ice Co. v. La Plant, 136 Iowa 621, 111 N. W. 1016, 12 L. R. A., N. S., 1073.

But such implied grants or reservations must be clearly within the intention of the parties. In Morrison v. Marquardt, 24 Iowa 35, 61, speaking through Chief Justice Dillon, the court said:

"The doctrine of implied easements rests upon the sup-

posed intention of the parties, as deduced from the situation and condition of the two estates. * * * Now the circumstances surrounding this transaction make it quite clear that it was never intended that this easement should exist.''

In Kane v. Templin, supra, we said [158 Iowa 24, 27, 138 N. W. 902]:

''It must be conceded that easements by implication are to be strictly limited to rights which in the very nature of the case must be presumed to have been in the minds of the parties concerned, appurtenant on the one hand and servient on the other; and the necessity of the use for the convenient enjoyment of the premises to which the easement is claimed as appurtenant is a material consideration in determining whether such easement is to be implied.''

Here there is no evidence whatsoever of an intention on the part of either Knowles or Snyder to reserve any such implied easement in the grantor. One alleged agreement between them, and the one which the defendants rather treat as their important and primary defense, completely refutes any such intention. So far as the record shows the mortgages of the various defendants described the respective parts mortgaged by their governmental descriptions. No mortgagee could well claim anything outside of these descriptions. While Oxley may have exercised control over these buildings, he assumed it without an order from the court, and the same is true of his superior, the Metropolitan Life Insurance Company. The defendants urge that Snyder never exercised any control over the buildings. He had no occasion to. His lessee farmed the entire Fagan land as a unity, just as he had done prior to these transactions. Some queries suggest themselves. If a grantor sold part of his land which had a building upon it, or a spring, pond, stream or flowing well, would the grantee and his successors be burdened with their use by those occupying the other portion of the land, simply because they had been so used when it was farmed as a unit?

It is our judgment that that part of the judgment and decree holding that the fractional southwest quarter of the northwest quarter of said section six shall be burdened with an easement in the matter of the use and occupancy of the barn

and crib now located upon it, together with such ground as may be necessary for their use, as an incident to the southwest quarter of said section, and the southeast quarter of the northwest quarter of said section and the ownership thereof, is hereby reversed, and that that part of the said judgment and decree establishing the governmental survey line between the fractional southwest quarter of the northwest quarter of said section, and the northwest quarter of the southwest quarter of said section, and the true and correct south boundary line of the said fractional southwest quarter of the northwest quarter of said section six, Township 87, Range 31, in Calhoun county, Iowa, is hereby affirmed.

The judgment and decree is hereby remanded to the said district court for the rendering and entry of a judgment and decree in conformity herewith.

Reversed in part and affirmed in part.

HAMILTON, C. J., and HALE, RICHARDS, SAGER, MILLER, OLIVER, and STIGER, JJ., concur.