FRANK WEBB et ux., appellees, v. OLLIE M. ARTERBURN et ux., appellants.

No. 48559.

(Reported in 67 N.W.2d 504)

December 14, 1954.

Don Carlos & Don Carlos, of Greenfield, and Wright & Kistle, of Council Bluffs, for appellants.

Williamson & Williamson, of Greenfield, for appellees.

Bliss, J.—In order to show the location of the land of the respective parties and of the roadway easement claimed by plaintiffs, we set out below a plat of Section 15, Township 75, Range 33, Adair County, Iowa, which we have outlined from the testimony and a rough drawing introduced as an exhibit.

The defendants own 240 acres of land, described as the NE¼ of the NW¼, W½ of NE¼, N½ of SE¼ and SW¼ of SE¼ of said Section 15, which they acquired by contract of purchase in 1946 and by deed in 1947 from the Bankers Life Insurance Company of Nebraska. Both defendants are grantees in the deed as joint tenants with the right of survivorship. The deed was duly recorded. The purchase price was $85 an acre. Defendants took possession of the land in March 1947. The only land of defendants involved in this litigation is the NE¼ of the

NW¼ of Section 15. We need only go back in the devolution of title to defendants' land to the year 1926. Sometime in that year John Glade bought and took possession of the 240 acres now owned by defendants. On November 5, 1926, John Glade and his wife, Elvira, executed their promissory note, and a mortgage securing its payment, on the said 240 acres, to the Bankers Life Insurance Company of Lincoln, Nebraska, which mortgage was placed of record. John Glade lived on this land until his death in the year 1931. Because of default in the performance of the provisions of the note and mortgage, foreclosure proceedings were brought by the mortgagee against the widow and the heirs-at-law of John Glade, which went to decree on January 16, 1932. Under special execution the property was sold at sheriff's sale to the mortgagee, and there having been no redemption a sheriff's deed was executed and delivered to the Bankers Life Insurance Company of Lincoln, Nebraska, conveying to it all of the said 240 acres of land, which deed, on March 7, 1933, was recorded in sheriff's deed record No. 153 at page 108.

Clarence Cramer and family took possession of the farm as tenants of the aforesaid Bankers Life Insurance Company in the spring of 1933 and continued to occupy and farm the land until the spring of 1946, at which time a tenant named Hemphill took possession and farmed the place until defendants moved onto it in March 1947.

Plaintiffs own and live on the S½ of the SE¼ of Section 10, across the public highway just north of forty acres of defendants' farm. They have no children, but a nephew lives with them in their four-room home. It does not appear how long plaintiffs have owned the aforesaid eighty acres, but Mr. Webb testified that he had lived on it about fifteen years, and first as a tenant in 1927. He was familiar with that vicinity for twenty-five years.

The SE¼ of the NW¼ of Section 15 is divided into two tracts by an east-west horizontal line. North of this line is a 17-acre tract with no building improvements. Its owner is Elizabeth Mattauch, who received a quitclaim deed to it dated April 27, 1897. There is testimony that one Jorgenson was a tenant of this land for a time.

The south twenty-three acres of this forty is owned jointly by the plaintiffs and is the tract from which they claim the easement for a roadway. The Nodaway River, a sinuous stream, flows south approximately midway through the east half of the NW¼ of Section 15. It divides the NE¼ of the NW¼ of Section 15, and also the Mattauch 17-acre tract, and the 23-acre tract of plaintiffs. The stream has no bridge over it in Section 15. The bottom land on each side is brush-grown and because of overflow waters the bottom land, that is free from brush, is uncertain for raising crops.

Plaintiffs' twenty-three acres have no improvements. Twelve acres are east of the stream and 4.6 acres of these are occasionally tillable. The remainder of it and all of the land west of the stream is but a wood lot. Plaintiffs use wood and cobs for heating their home and for cooking purposes. The wood is procured from the 23-acre tract. In 1948 a good crop of corn was raised on the 4.6 acres, but floodwaters have seriously interfered with farming in other years. In 1937 Mrs. Webb's father was a tenant of the twenty-three acres, and Mr. Webb did some work on it as a hired hand.

Plaintiffs bought this acreage in 1942 by contract from Dr. R. H. Gregory and F. H. Grant and received deed to it filed May 10, 1945, for a recited consideration of $600. The grantors received deed to it and to other land by deed filed November 5, 1925.

Plaintiffs allege in paragraph 3 of their petition that: About the year 1927, John Glade, who then owned the land of the defendants, orally granted to plaintiffs' grantors, Gregory and Grant, a permanent right-of-way and easement over the land of Glade, "said right-of-way and easement being located along the East side of the Northeast Quarter of the Northwest Quarter of Section 15 * * *. That the roadway at that time had been used for many years by the predecessors in title to R. H. Gregory and F. H. Grant and the act was not only a grant of an easement but the confirmation of a right existing at that time.

"4. That since * * * 1927 when said easement was granted and for more than ten years last past the plaintiffs and prior owners of plaintiffs' land have used said roadway as a means of

ingress and egress to their said premises, continuously and without interruption or hindrance, and with the full knowledge, assent and acquiescence of the prior grantors of the defendants, and of the defendants up until the year 1951 when defendants plowed up said roadway and thereafter the plaintiffs traveled over other land of the defendants to reach said land owned by the plaintiffs.

"5. That defendants have been the owners and in possession of their said premises for over five years and knew of and acquiesced in the usage of said roadway by the plaintiffs, and said usage was apparent at the time the defendants purchased the land owned by them.

"6. That defendants on the 5th day of March, 1952, caused to be served upon plaintiffs a notice of their intention to dispute any right arising from such claim and use and have thereby disturbed the plaintiffs' right therein. That plaintiffs were further notified that any usage by them after the 15th day of March, 1952, would be considered by defendants to be a trespass on the part of the person so doing and would be treated accordingly."

Plaintiffs also alleged that they had no access to the twenty-three acres other than by the alleged roadway easement and that they were damaged in the sum of $1000.

They prayed for the establishment of the easement and the quieting of title to it in them, and for an injunction against defendants for interference with plaintiffs' claimed easement rights. Damages of $1000 were prayed for.

Defendants moved that plaintiffs specify in their petition the width of the claimed roadway, whether or not it was a straight roadway, and its distance west of the East line of the NE¼ of the NW¼ of Section 15. Defendants also filed a motion to strike the petition upon the grounds that: an oral grant of any right-of-way or easement cannot be the basis of any cause of action against defendants; that an owner of land cannot grant a permanent right-of-way in the land of another which is binding on a subsequent purchaser thereof, by an oral agreement, in no manner recorded; and that use alone even when coupled with an oral grant cannot ripen into a permanent easement under the laws of Iowa. Both motions were denied.

Defendants' answer admitted the respective allegations of land ownership, but denied all other allegations of the petition. Defendants also alleged that: they were good faith purchasers of their land from the Bankers Life Insurance Company, by warranty deed without any reservations of any easement or other limitations and without any notice, knowledge or means of knowledge of any easement, and after having an examination of the abstract of title showing no easement; that after the service of notice on plaintiffs on March 6, 1952, to desist from passing over their premises after March 15, 1952, plaintiffs acceded and thereby waived any rights they may have previously claimed.

The trial of the suit began December 15, 1952, and the court filed findings of fact, conclusions of law, and decree for plaintiffs, on July 9, 1953. The court found that: For twenty-five years prior to 1949, when it was plowed up, a roadway existed along the east side of the Northeast Quarter of the Northwest Quarter of Section 15 of defendants' land and terminated in a gate in the Northeast corner of said forty acres; said roadway was worn and traveled and visible when defendants acquired their land; the roadway had been continuously used by plaintiffs as a means of access to their twenty-three acres, and that their claim of easement was hostile to defendants and that they and their predecessors in title had express notice of plaintiffs' claim of right to use said road.

As a conclusion of law the court stated that plaintiffs had brought themselves within the provisions of section 564.1 of the 1950 Iowa Code.

While denying plaintiffs' claim for damages, the court otherwise decreed as prayed by plaintiffs. Plaintiffs did not pray for a roadway easement of specific width, or definite location. Neither does the decree establish such a roadway easement. It simply decrees that plaintiffs "are the owners of a permanent easement along the East side of the Northeast Quarter of the Northwest Quarter of Section 15 * * *"; and quiets title therein in plaintiffs, and enjoins defendants from interfering therewith. We are in agreement with the district court in denying

damages to plaintiffs, but it is our conclusion that the record and the evidence, in other respects, do not sustain the findings of fact, conclusions of law or the decree.

The plat herein is, in general, self-explanatory. The six 40-acre tracts of defendants' 240-acre farm are separately indicated thereon.

On the plat we have indicated the claimed roadway easement by the broken line AB, not because the petition nor the decree so located it, but because each plaintiff testified that "when I traveled *along the east side of this forty* I traveled or used about 20 feet wide." (Italics ours.) The fact is clearly

established that in crossing the land of defendants the plaintiffs used various routes.

The only easement claimed by plaintiffs is across the northwest forty of defendants' farm. While plaintiffs crossed the 17-acre tract of Mrs. Mattauch to get to defendants' northwest forty, any easement across the 17-acre piece is not involved in this suit. Plaintiffs offered no evidence of the grant of any easement over the seventeen acres.

We gather from plaintiffs' petition as a whole that they are claiming, in addition to an oral grant, the easement by acquiescence and by adverse possession, although the allegations are very general and do not specifically so state. Plaintiffs offered two items of testimony in support of their claim to an oral grant of the easement across defendants' land. One item was by the testimony of Jacob D. Glade, a son of John Glade hereinbefore mentioned. Testifying for plaintiffs, he said that in 1927 or 1928, when he was about eighteen years old and was living in the parental home on the farm now owned by defendants, he recalled a conversation in the barnyard, in which he took no part, between his father and Dr. R. H. Gregory. Over defendants' objection, he related the conversation thus: "Well, Mr. Gregory came out to the farm there that day and says, 'I have bought this twenty-three acres down back there and I would like to know about the right-of-way in there, this right-of-way along the east side of the west forty', and Dad says, 'Yes', he says, 'they always used that, sure. I definitely do cover the right-of-way there.' Mr. Gregory says, 'Now, I think probably we will sell this land again. Does that right-of-way go to anyone that might buy this land'? Dad says, 'Why, sure, I definitely give you a right-of-way here'." No one else was present at the conversation. John Glade and Doctor Gregory were both dead at the time of the trial below. This conversation took place two or more years after Gregory had become owner of the twenty-three acres and had nothing to do with his purchase. It was not an agreement between the two. Glade received no consideration for the permission or grant, if such it was.

The other item was testimony by each plaintiff of a conversation had by them with Dr. R. H. Gregory. Over defendants' objection Mr. Webb was asked, "What was said between you and

Doctor Gregory relative to this right-of-way to the land at the time you purchased it, or about that time?" The witness answered: "He said he had an easement through that right-of-way and it went with the land and it went to us. We had the same as he had." Of the same occasion, Mrs. Webb was asked what was said in the conversation between her and R. H. Gregory "relative to this road right-of-way." Over objection she answered: "I asked him if the right-of-way went with the land, that we would have a permanent way to our land, and he said it went with the land. That John Glade had given an easement to the land. Q. Who said that last statement? A. Doctor Gregory. R. H. Gregory. Q. State all the conversations between you and R. H. Gregory at the time you closed the deal. A. I asked him, R. H. Gregory, if the right-of-way to that land, to the ground that we were buying, went with the land; that we would have a permanent way to our ground, and he said that it did; that John Glade had given an easement across his ground, the west forty, along the east side of the west forty to the ground we had bought." Objections were made to this testimony, and motion to strike it because it was hearsay, not binding on defendants, the witness was incompetent under the "dead man" statute, and it was within the statute of frauds. The testimony was received subject to the objections, as was all testimony.

■ All statements tending to show the purported grant of the easement across the land of the defendants were confined to these two conversations. There is no other evidence to that effect. But whether the testimony was admissible or nonadmissible or whether the court did or did not consider it, is, in our judgment, all quite immaterial in the determination of this appeal. The court stated, as a conclusion of law, that plaintiffs had brought themselves within the provisions of section 564.1 of the Iowa Code of 1950. We think under the record and the evidence the court's conclusion is erroneous. The Code section is:

"Adverse possession—'use' as evidence. In all actions hereafter brought, in which title to any easement in real estate shall be claimed by virtue of adverse possession thereof for the period of ten years, the use of the same shall not be admitted as evidence that the party claimed the easement as his right, but the

fact of adverse possession shall be established by evidence distinct from and independent of its use, and that the party against whom the claim is made had express notice thereof; and these provisions shall apply to public as well as private claims."

It is true there is evidence that plaintiffs and their predecessors and others who were interested in the 23-acre tract, for many years in going to and from said tract passed over the farm, now owned by defendants, by various routes. But there is a total absence of evidence in the record that the Bankers Life Insurance Company of Nebraska, which had title to all of defendants' land from March 1933 until it was sold by them in 1946 to the defendants, or that defendants had "express notice" of or any notice or knowledge whatsoever that such users of the land now owned by defendants claimed a right or a grant to a permanent easement for roadway purposes over any part of said land. There is no evidence that plaintiffs, or any of their predecessors in title to the twenty-three acres, ever had any contacts of any kind with any officer or representative of the Bankers Life Insurance Company, or ever made known to said company in any way that they claimed as a matter of right any way or roadway easement over the NE¼ of the NW¼ of said Section 15. Neither plaintiff had ever made any assertion to either defendant that they claimed the right to any roadway easement or right-of-way over any part of defendants' land. Plaintiffs did testify that they had so claimed. Mr. Webb testified that he had abided by the written notice which defendants caused to be served on him in March 1952 directing him not to cross their land. His testimony was: "I haven't gone in there since the notice was served on me. * * * I did not go in there after the 15th of March." Mrs. Webb testified: "Since the notice was served on me and my husband I haven't tried to exercise any right to go over any part of the Arterburn land in the slightest. I have had a conversation about it with Arterburn since the notice was served. We asked him why he served it, his reason for serving, and we tried to come to an agreement. Q. What did he say when you asked him why? A. Why he served it? Q. Yes. A. He didn't want us to go over his land. Q. And

then you tried to make an agreement or get the right to go over his land? A. Yes. Offered to buy or sell, or if there was anything else."

Plaintiffs not only did not claim the right of an established easement, nor protest against its violation, but, inconsistent with any such claim, they sought to make an agreement with defendants for a right to go over their land.

Mr. Arterburn testified that the first knowledge or notice he had that plaintiffs claimed the right to an easement across his land came not from the plaintiffs, but from their lawyer. His testimony in cross-examination was: "I say I first found out he claimed a right-of-way down across there on March 15, 1952. I had sent him a notice and I got a notice from you. I never knew until that time that there was any claim at all." This testimony is in no way rebutted.

The only evidence that any predecessor in title to defendants' land had any notice or knowledge of the grant of a roadway easement across this land is in the testimony of Jacob Glade of the conversation between his father and Doctor Gregory, hereinbefore stated. At the time of this conversation the Bankers Life Insurance Company's mortgage was already a prior lien on the John Glade land. The claimed roadway grant was junior and subject to that lien and was extinguished in the foreclosure proceedings, which divested the Glades of any interest in the land. This grant never ripened into a permanent easement against the Glades by ten years of adverse possession or acquiescence. They never owned the land for that length of time.

There is no question under the record that plaintiffs and their predecessors in interest in the twenty-three acres, in going to and from it, passed across parts of the land now owned by defendants, but the testimony varies considerably as to the routes taken. There was a fence along the north line of the NE¼ of the NW¼ of Section 15, with a crude gate at its east end. This gate consisted of a top and a bottom strand of barbed wire with a piece of woven wire between these strands held upright by a wooden stave. The east end of the gate was a movable pole to which the wires were attached. The bottom of the pole was inserted in a loose wire loop around the base of the corner

post, and a similar wire loop at the top of the corner post held the top of the gate pole in place. The gateway is twelve feet wide. Mr. Arterburn testified that he had always maintained the gate and that no one had ever helped or offered to help him do so. Mrs. Ann Cramer, who with her husband, for thirteen years were tenants of the Bankers Life Insurance Company, the grantor of defendants, testified as a witness for plaintiffs that this gate was useful in their farming operations and was used by them in hauling wood from the river bottom. Mrs. Cramer first testified in answer to a leading question that there was a road showing travel south from the gate along the east fence line of the northwest forty of the farm, but on cross-examination she testified that a short distance south of the gate a ditch came from the forty just east and ran west to the river, which prevented vehicles from going south along and near the east fence line. She could not say how deep the ditch was, but said "it got deeper and deeper" and in order to cross the ditch they went west toward the center of the forty until the ditch flattened out.

Mr. Webb spoke of the ditch as a "little creek" running straight west to the river, and said on one occasion he and his wife went with a team and wagon through the gate into the northwest forty on their way to pick corn on the twenty-three acres. He testified that they "did not go straight south along the east line of the forty acres down to where our cornfield was * * *. We went west when we came to the creek about a couple hundred feet, then straight south—the ditch got shallow where you could cross it. I went west 200 feet, then straight south for a ways and then angled back southeast along the river, so I wouldn't run over any corn."

Mrs. Webb testified that in years past she had seen Chris Jorgenson go down across this west forty and had also seen others do so on their way to hunt or fish.

Mr. Arterburn testified that in 1946 before buying the 240 acres he went over it with a land agent who had it for sale. They went through an old fence along the east side of the forty, involved in this litigation, and west across it to the river, which they crossed on a fallen tree, and then went south on the west side of the river and recrossed to the east side of the river. He

testified that he saw no roadway along the east side of this forty acres or elsewhere in it. The only wheel tracks he saw were those of the wagons of Mr. Hemphill, the tenant, used in picking corn. Along the south twelve rods of the east line of this forty— it was the west one of his two north forties—was a clump of trees, and tangled grapevines which projected over the fence about three rods in width. This fence would not turn livestock and defendants electrified it in 1948. Shortly after that Mr. Arterburn saw Mrs. Webb's nephew drive through this fence and tear a hole in it, and at once warned Mr. Webb not to repeat it. The current was not on at the time. In 1949 defendants took out the old line fence, chopped down the trees and blew out the stumps and plowed the ground. That year they planted both north forties in corn and farmed the entire tract from the highway on the east to the river, as one piece. Plaintiffs made no complaint about the plowing up and the cultivation of any claimed roadway and asserted no claim to any easement across the land.

With reference to the different routes across his farm which plaintiffs and their helpers at different times took, Mr. Arterburn testified: "Mr. Webb started going through in the spring of 1947. He was going down to his 23-acre patch. I had never had any conversation with him regarding an easement or right-of-way that he claimed over any part of my land until this year of 1952. I just put up a sign there to 'Keep Out.' I saw them come along that old fence row they talk about and turn and go west probably eight or ten rods and around back up that creek and go south. I have also seen them come down along the north side down clear below that ditch and go straight on south. And they have taken down right across the corner down to this little creek and right on south. The creek I mean is that ditch that comes out of this east forty down through the west forty running west. Where the ditch crosses this old fence line it is about ten rods south of my north fence line. At that point the ditch is somewhere around five feet wide and anyway three feet deep. From the old fence line it extends west approximately ten rods; there it is not deep but just spills out like an overflow area. It is running about east and west from the old fence line over to where it does flatten out.

When I said I saw him go over to that ditch and then go west it was right along the north bank of that little ditch. Sometimes they would go back up along the south side of the little ditch and south and east about ten rods—the same as going down—up to where the old fence line was. Then they would go south along the old fence line, around the trees sticking out there, and on south. I have seen them come in the gate and go directly west along the north fence line ten or twelve rods and then go south to where they had to go to get below this little ditch. There is sort of a rectangle in this forty formed by the north fence line, this old fence line going south or where there used to be a fence, and this ditch going east and west. I saw them cut across that to the southwest corner. I have seen them go from the west side of the ditch in a southwesterly direction toward the river. The river runs through this land in a more or less north-and-south direction. The river comes onto my land pretty close to the middle of the west forty. Then the river runs south, it is awful crooked. When it gets to the south line of this forty it leaves my land pretty close to the east side of my forty, and then it goes on south and takes off west.

"When Webb used this claimed right-of-way it was when he went down to get wood. He has had a little corn down there, but that is all, no other crops. I have seen or known of Mr. Webb going to his twenty-three acres over some other part of my land than this alleged right-of-way; he has come through the barnyard on up around and down across to get there. My barnyard is just a little ways south of this northeast forty; I have a forty acres south of there and my barnyard is on the west side of the road pretty well to the north side of the second forty. He has come through my barnyard, gone north up a little to the south side of the north forty and then west down to his piece. Some years he didn't come by the claimed right-of-way in going to his twenty-three acres at all, some years he did. He never went that way too many times. He went down there not necessarily to take care of whatever he had there; sometimes he would go through. * * * I saw him go down in there and I never said anything to him at any time. He never said anything to me. * * * During the years I have

lived on this farm there has not been any marked right-of-way or roadway in the northwest forty. As a matter of fact, there isn't enough travel along there to make any marks or impressions on the ground to make a roadway."

Robert Arterburn, the grown son of defendants, was first on the farm in the spring of 1947, and has worked there since. He testified: "I never saw anything that would indicate a road of any kind along any portion of that forty [NE¼ of NW¼ of Sec. 15] at that time [1947]. During the years since that time I have not observed what I would call a roadway across any part of that west forty; there might have been some tracks down through there, a team or wagon track across it. Not anything to establish a road. They were just any place; not one line in particular."

Albert Westphal, a farmer living a half mile west of defendants' farm testified that he helped defendants thresh oats in 1950; except for about five acres at the east end the two north forties clear to the river were in oats: "I saw no evidence of a roadway or a right-of-way along anywhere on that part of the west forty east of the river; all of what I saw was oats stubble. I never saw any evidences of a right-of-way." In 1951 the witness was on the farm helping to construct a north-and-south woven-wire fence between the two north forties. He testified: "During that time I never saw any evidence of any right-of-way across the east part of this forty." The witness knew the plaintiffs, and said he had seen them go past his place to get into that part of their twenty-three acres which was west of the river.

Plaintiffs offered no rebuttal testimony. They made no attempt to deny the testimony for defendants respecting the various routes of going to and from the twenty-three acres, and the absence of any definite or observable roadway from this acreage across defendants' west forty acres along and adjacent to the east line thereof. In fact, the evidence for plaintiffs, in large part, is corroborative of the evidence for defendants.

It appears to this court that any use by plaintiffs, or others

interested in the twenty-three acres, in passing over the land of defendants, in going to and from said acreage, has been permissive only and revocable at all times, and that there never had been any definite, used or observable roadway along the east line of said forty acres or elsewhere in it. There is no evidence that any roadway easement over any part of defendants' land was ever established by mutual acquiescence, prescription or estoppel. There is no evidence that plaintiffs nor any previous owner of the twenty-three acres ever expended any time, effort or money in the making or maintaining of any roadway over any of the land now owned by defendants.

I. Plaintiffs base their right to the relief prayed in their claim to a permanently established easement for road purposes, located as hereinbefore stated, across a certain forty acres of defendants' 240-acre farm. In Cook v. C., B. & Q. R. Co., 40 Iowa 451, 456, this court said:

"An easement is a liberty, privilege or advantage in land without profit, existing distinct from the ownership of the soil; and because it is a permanent interest in another's land, with a right to enter at all times and enjoy it, it must be founded upon a grant by writing or upon prescription."

See also Stokes v. Maxson, 113 Iowa 122, 124, 84 N.W. 949, 86 Am. St. Rep. 367; Dawson v. McKinnon, 226 Iowa 756, 766, 285 N.W. 258; Independent School District of Ionia v. DeWilde, 243 Iowa 685, 692, 53 N.W.2d 256; McKeon v. Brammer, 238 Iowa 1113, 1117, 29 N.W.2d 518, 174 A. L. R. 1229; Walker v. Dwelle, 187 Iowa 1384, 1387, 175 N.W. 957.

II. Easements in real estate may be established in various ways, as by written grant, by prescription, by necessity or by implication. McKeon v. Brammer, supra, 238 Iowa 1113, 1119–1121 (wherein it is said: "Actually an easement, created by implication or prescription, is based on the principle of estoppel.") ; Independent Sch. Dist. v. DeWilde, supra, 243 Iowa 685, 692; Paul v. Blakely, 243 Iowa 355, 358, 51 N.W.2d 405; Loughman v. Couchman, 242 Iowa 885, 888, 47 N.W.2d 152; Restatement of Property, Servitudes, chapter 38, pages 2921 et seq. Plaintiffs do not base their claim to an easement

upon any writing. They allege in their petition that there is no way to reach their land east of the river "except by the right-of-way and easement heretofore described." That fact does not make the easement claimed, an easement by, or of, necessity. So far as the record shows the respective lands of the parties were never owned by one party nor operated as a unity. Speaking of what is an easement of necessity, the court, in Zimmerman v. Cockey, 118 Md. 491, 495, 496, 84 A. 743, 745, said:

 "It is a well-settled principle that where land is conveyed by one person to another, and the lot so transferred is entirely enclosed by the lands of others, that the grantee is entitled by implication to a right of way over the lands of his grantor, as a way of necessity, so that he may have a means of ingress from and egress to the nearest public way. Tiedeman on Real Property, sec. 609."

See also Collins v. Prentice, 15 Conn. 39, 38 Am. Dec. 61; McTavish v. Carroll, 7 Md. 352, 61 Am. Dec. 353, 357, 358; Cassens v. Meyer, 154 Iowa 187, 190, 191, 134 N.W. 543; Rater v. Shuttlefield, 146 Iowa 512, 515–517, 125 N.W. 235, 44 L. R. A., N. S., 101; Bagley v. Petermeier, 233 Iowa 505, 508, 10 N.W.2d 1, and cases cited. Neither was the claimed easement one created by implication. McKeon v. Brammer, supra, 238 Iowa 1113, 1119; Dyer v. Knowles, 227 Iowa 1038, 1042–1045, 289 N.W. 911.

 III. Consequently if plaintiffs have the roadway easement which they claim, it must be an easement by prescription, or, as otherwise stated, by adverse possession, under claim of right or color of title, openly, notoriously, continuously, and hostilely asserted against defendants for ten years or more. Defendants own the 240-acre farm by warranty deed in the regular chain of title, and have been in actual possession and operation of the farm since March 1947. As against such possession and title the plaintiffs have a heavy burden in seeking to have a court establish by decree the servitude of the alleged easement upon and across the forty acres of the farm. The matter of acquiring ownership of, or interests in, or of burdening, real estate with easements has been before this court a great many times, in various types of actions, and based upon

evidence of a character like unto that of the plaintiffs. It has been the long-established rule and the controlling principle of the court that the claimant must establish his cause of action by evidence that is clear, convincing and satisfactory, and we have said on occasion it must be conclusive. We cite some of our many cases: Culver v. Converse, 207 Iowa 1173–1180, 224 N.W. 834; Ross v. Ross, 148 Iowa 729, 733, 127 N.W. 1034; Baker v. Fowler, 215 Iowa 1157, 1159, 1163, 247 N.W. 676; Runnels v. Anderson, 186 Iowa 1370, 1380, 1381, 173 N.W. 91; Hatcher v. Sawyer, 243 Iowa 858, 864, 52 N.W.2d 490; England v. England, 243 Iowa 274, 278, 51 N.W.2d 437; Chicago & N.W. Ry. Co. v. Sioux City Stockyards Co., 176 Iowa 659, 668, 670, 158 N.W. 769; Briles v. Goodrich, 116 Iowa 517, 518, 90 N.W. 354; Kelley v. Kelley, 189 Iowa 311, 317, 318, 177 N.W. 45; Farlow v. Farlow, 154 Iowa 647, 649, 135 N.W. 1; Sinclair v. Allender, 238 Iowa 212, 221–224, 26 N.W.2d 320; Myers v. Myers, 197 Iowa 1137, 1139, 198 N.W. 484; Hayes v. Dean, 182 Iowa 619, 626, 164 N.W. 770; Williams v. Harrison, 228 Iowa 715, 722, 723, 293 N.W. 41; Slack v. Herrick, 226 Iowa 336, 338, 283 N.W. 904; Williamson v. Williamson, 4 (Clarke) Iowa 279, 281; Newell v. Tweed, 241 Iowa 90, 97, 40 N.W.2d 20; Nichols v. Kirchner, 241 Iowa 99, 103, 104, 40 N.W.2d 13, 16 ("* * * the doctrine [adverse possession] is to be taken strictly. There are usually no equities in favor of one who claims property of another by adverse possession and his acts are to be strictly construed. The law presumes the possession of land is under the regular title."); Roberts v. Walker, 238 Iowa 1330, 1335, 30 N.W.2d 314; Peddicord v. Peddicord, 242 Iowa 555, 560, 47 N.W.2d 264; Gerdts v. Mulford, 230 Iowa 647, 652, 298 N.W. 873, 875 ("The establishment of an alleged oral gift or grant of a permanent easement in real estate must be by clear, definite and unequivocal testimony. * * * Such a contract easement cannot be established by evidence which is perfectly consistent with a mere naked license only, revocable at pleasure.")

IV. Plaintiffs base the inception of their claim to the easement to the alleged oral gift thereof by John Glade to Doctor Gregory in 1927 or 1928. The only evidence in support thereof is the testimony of a son of Glade who as a boy over-

heard the "barnyard conversation" of his father and Gregory, but took no part therein. This testimony was within the Statute of Frauds. Both participants were deceased at the time of the trial. It might well be that Glade as a neighborly courtesy gave Gregory license or permission to pass over the former's ground. But it is fair to assume that it was unlikely that Glade, without any benefit to himself, but, on the contrary, to his own detriment, would burden his farm with a permanent road that would be an inconvenience and a damage in its operation and would also seriously depreciate the selling price. It cannot be said that Glade in any way misled Gregory to his disadvantage. The gift, if made, was not an inducing factor in the purchase of the twenty-three acres by Doctor Gregory. He had previously acquired it. He made no improvements and there is no evidence of any expenditures by him or by plaintiffs.

Testimony of the son of John Glade has other inherent weaknesses. Attempts to retell casual conversations of years long past are beset with many uncertainties. The memory of such matters is subject to much imperfection. Through lack of interest in what was said and lapse of time the conversation is not recalled with accuracy nor certainty. Such testimony should be cautiously received and closely scrutinized. It is subject to many frailties. The speakers are dead and there is no one to speak for them, and denial of the testimony of the witness is usually impossible. Baker v. Fowler, supra, 215 Iowa 1157, 1159; Ross v. Ross, supra, 148 Iowa 729, 733–735; In re Estate of Rich, 199 Iowa 902, 916, 917, 200 N.W. 713; Elder v. Brown, 203 Iowa 1124, 1132, 1133, 212 N.W. 147.

What we stated just above is also applicable to the testimony of plaintiffs respecting their conversation with Doctor Gregory with the additional weakness that they are specially interested witnesses. The only easement right that Doctor Gregory told them of was the one given him by John Glade, which did not then exist. It was never an established easement. If it ever existed, it was but an oral gift which had never ripened into a fixed and permanent easement by ten years of adverse user as against Glade or his heirs. It was at all times subject and inferior to the mortgage lien of the Bankers Life Insurance

Company which culminated in a sheriff's deed in the foreclosure proceedings, divesting the Glades of all rights in, and title to, the mortgaged land. Doctor Gregory in 1942 when he sold the twenty-three acres to plaintiffs had no easement right to pass on to them. There is no evidence that the insurance company had any knowledge of any user of any way across the 40-acre tract by Doctor Gregory. The court stated that the insurance company did not object to such user. This finding has no support in the record. On cross-examination by defendants' lawyer of Mrs. Cramer, the wife of the company's tenant, she was asked: "You weren't trying to give away any land that belongs to the Bankers Life Insurance Company, were you? A. I had nothing to do with that whatever. The Bankers Life didn't object to the road." This testimony is all there is in the record with respect to the Bankers Life Insurance Company and any easement across its property. The tenant may have permitted the use of a way across the leased property by those interested in the twenty-three acres, but such license would not tend to establish an easement, or even a license, by the owner. Of a similar situation in Jones v. Peterson, 178 Iowa 1389, 1395, 161 N.W. 181, 183, the court said: "There is no principle of law by which we may impute to the owners the knowledge of their tenants, or even the knowledge of an agent having no authority to sell. Daniels v. Chicago & N.W. R. Co., 35 Iowa 129."

■ V. We have already set out section 564.1 of the 1950 Code of Iowa, a provision which has been statutory law of Iowa since the Code of 1873. It has since been the paramount law on the subject matter. Under that statute and its construction and interpretation by this court, the mere permissive user of, or the license to use, any easement in real estate *without claim of right to such use,* no matter how long continued, can never ripen into a permanent easement, so as to run with the land regardless of its grant or reservation in a deed. Feilhaber v. Swiler, 203 Iowa 1133, 1138, 1139, 212 N.W. 417; Molene v. Tansey, 203 Iowa 992, 994, 213 N.W. 759; Friday v. Henah, 113 Iowa 425, 427, 85 N.W. 768; Young v. Ducil, 188 Iowa 410, 416, 176 N.W. 272; Gerdts v. Mulford, supra, 230 Iowa 647, 651–653; Loughman v. Couchman, 243 Iowa 718, 721, 53 N.W.2d

286; Culver v. Converse, supra, 207 Iowa 1173, 1175; Ott v. Freese, 197 Iowa 528, 531, 532, 197 N.W. 472; Lehfeldt v. Bachmann, 175 Iowa 202, 209, 210, 157 N.W. 456; Austin v. Baxter, 189 Iowa 138, 142, 143, 176 N.W. 277; McBride v. Bair, 134 Iowa 661, 664, 112 N.W. 169; Manning v. George, 205 Iowa 994–999, 219 N.W. 135.

 VI. A decisive factor in this case, which, standing alone, compels its reversal, is the fact that plaintiffs have not complied with said section 564.1, Code of 1950, by establishing that defendants or their grantor had "express notice" or any notice or knowledge whatsoever that plaintiffs or their predecessors in title *claimed the easement as a matter of right*. Notice of user of the easement is not sufficient. The burden also was on plaintiffs, under the statute, to prove that defendants and their grantor had "express notice" of a "claim of right" on the part of plaintiffs and those under whom they claim. As stated in Young v. Ducil, supra, 188 Iowa 410, 416:

"Mere proof of use, therefore, is not sufficient. The use may be permissive only. To invest the plaintiff with a right to a continued use, he must show something more than use for the statutory period, and two things more are essential: (1) That he claimed an easement as his right, and this must be established by evidence distinct from and independent of its use; and (2) that the party against whom the claim is made had express notice thereof—*that is, not of the use, but of the claim of right to use against* the objections or protest of the owner."

See cases cited in Division V hereof, and Chicago, M., St. P. & P. R. Co. v. Cross, 212 Iowa 218, 224, 225, 234 N.W. 569; Paul v. Mead, 234 Iowa 1, 11, 11 N.W.2d 706; Ellsworth v. Martin, 208 Iowa 169, 172, 173, 225 N.W. 417; Black v. Whiteacre, 206 Iowa 1084, 1088, 221 N.W. 825; State v. Mitchell, 58 Iowa 567–569, 12 N.W. 598; Zigcfoose v. Zigefoose, 69 Iowa 391, 392, 28 N.W. 654.

It is our conclusion that plaintiffs have fallen far short of the requirements of the statute and of the decisions of this court in producing evidence of the quality and quantity essential to justify the relief and remedies prayed for. The decree

of the district court is therefore reversed and the cause is remanded to that court for the entry of a decree in conformity with this opinion.—Reversed and remanded with directions.

GARFIELD, C. J., and OLIVER, WENNERSTRUM, MULRONEY, HAYS, THOMPSON, and LARSON, JJ., concur.